**UNITED STATES**

v.

**Sergeant Levern CREDIT, FR 429–04–4836 376th Organizational Maintenance Squadron Fifth Air Force (PACAF).**

ACM 21959.

U. S. Air Force Court of Military Review.

Sentence Adjudged 1 Aug. 1975.

Decided 1 July 1976.

Appellate counsel for the Accused: Colonel Jerry E. Conner and Major Byron D. Baur.

Appellate counsel for the United States: Colonel Julius C. Ullerich, Jr.

Before ROBERTS, HERMAN, ORSER and SANDERS, Appellate Military Judges.

## DECISION

ROBERTS, Senior Judge:

Tried by a general court-martial which included members, the accused stands convicted, contrary to his pleas of not guilty, of the crime of rape, in violation of Article 120, Uniform Code of Military Justice, 10 U.S.C. § 920. The charges were referred to the court-martial as a noncapital case, and the maximum authorized punishment included confinement at hard labor for life. The court-martial imposed, and the convening authority approved, a sentence of a dishonorable discharge, confinement at

hard labor for three years, forfeiture of all pay and allowances, and reduction to the grade of airman basic.

Appellate defense counsel have asserted several errors dealing in the main with military due process, many of which are in amplification of issues ably litigated at trial. For a better understanding of the issues, and the context in which they arose, we will first briefly summarize the evidence contained in the record of trial.

At about a half an hour before midnight, the victim, a woman in the United States Air Force, was walking along a dimly lit sidewalk toward her barracks at Kadena Air Base, Okinawa, Japan. The evidence in the record overwhelmingly establishes, and the accused admits, that as she was doing so, the accused rushed upon her from behind, threw a coat over her head, and violently dragged her to a wooded area some distance away. After she had fallen to the ground while struggling to get away, he stripped the clothing from her pudenda. Within a few minutes a noncommissioned officer who was a stranger to both of them walked nearby, observed what he thought to be a fight, and turned their way to render assistance. The accused jumped up and ran away. The victim claimed then and persisted in her testimony at trial that she had been raped. She was unable to see what had happened, because the accused kept her head covered with his coat throughout the assault. But she was absolutely certain that the accused had forced his penis into her vagina and had sexual intercourse with her against her will.

In a pretrial oral statement, the voluntariness of which is not contested, the accused admitted that he had attacked and partially stripped the victim as she claimed. He denied, however, that he had raped her or that he had even so much as exposed himself during the encounter. In explanation of his conduct, the accused said he had mistaken the victim for another girl who made a vicious racial slur against him earlier in the evening. He felt that appropriate vengeance for the remark would be for him to make her "run naked in the woods" as she had told him to do. After he realized he had the wrong girl, he decided to take off her clothing, nonetheless, in order to delay her in reporting the incident. He admitted that during the struggle he "may have" inserted his finger into her vagina.

The question of the victim's prior chastity was dwelled upon at length during her testimony. She admitted that she had frequently had sexual intercourse with her fiance. She acknowledged that her fiance was already married, although separated from his wife. She had become pregnant and had undergone a therapeutic abortion several months before she was assaulted by the accused. She said, however, that she had not had sexual relations with her fiance in the prior two weeks as their conflicting duty shifts prevented it, and because her menstrual period had started approximately a week before the attack.

The sexual delicts of the victim were only weakly exploited by the defense to insinuate that she might have consented to sexual intercourse. Under the brutal and fearful circumstances of the offense any suggestion of consent is untenable, and we dismiss it out of hand, as apparently did the court below. What the defense sought to do with the evidence was to raise a reasonable doubt that immotile spermatozoa found in the victim's vagina had been deposited there by her fiance, rather than by the accused, and that therefore the victim was mistaken or untruthful in her assertion she had been raped. Before discussing the scientific evidence pertaining to the spermatozoa found, we note in passing the obvious incongruity in the position that the victim was sexually promiscuous but still was unable to know whether her vagina had been violated by the accused's finger or by his penis.

The real and circumstantial evidence in the record of trial effectively resolves this factual issue adversely to the accused and proves beyond question that the victim's assertion that she had been raped is truthful and correct. Within an hour and a half after the attack, she was seen by a well qualified gynecologist who examined her

thoroughly and took specimens from her vagina and the opening of her cervix for several basic clinical tests. His examination did not reveal any injuries, but he observed that she was agitated, angry, and extremely cooperative in the examination. He could observe that she had recently ended a menstrual period, as there was still a bloody tinge to her vaginal fluids. While he was conducting his examination he was informed that one of the laboratory technicians had found immotile spermatozoa in a specimen the gynecologist had taken from her vagina. The circumstances and admissibility of this particular test will be treated at greater length below, but it was a significant factor in the examining gynecologist's conclusion that the victim had recently had sexual intercourse. He would not commit himself as to the exact time this occurred, but he did say the results of his examination would be consistent with intercourse within the previous two to forty-eight hours. He opined that spermatozoa would not be found in the vagina for a much greater period and that in any event any spermatozoa deposited in the victim's vagina earlier would have been washed away by her recent menstrual period.

One of the specimens of the vaginal fluids taken from the victim was delivered immediately to the laboratory of the hospital where she was being examined. This was the "wet mount" test for the determination of the motility of any spermatozoa that might be found. The remaining specimens were prepared in different manners for four other complementary tests. The following morning the pathologist in charge of the laboratory personally conducted a Pap smear test and also participated in the calculations of the spectrometer measurements of an acid phosphatase test. In the Pap smear test he observed the presence of spermatozoa. As that test involves the mounting of the specimen on a glass slide and fixing it with an alcohol based stain, the sperm he saw were necessarily immotile. The level of acid phosphatase found in the vaginal specimen established the presence of seminal fluid, as acid phosphatase is produced by the male prostate gland. The

one specimen which had been delivered directly to the laboratory the night before was not seen by the pathologist. This was the "wet mount" test in which the vaginal specimen was prepared in a saline solution, and according to laboratory protocol, was to be microscopically observed as soon as possible in order to determine whether any spermatozoa found was motile. This test was done during the night by the technician then on duty, Specialist Fourth Class Garcia. Garcia's determination that immotile sperm were present was recorded on a laboratory slip, time stamped "0116", and was available to the pathologist before the other tests were done. The remaining two tests were to determine whether any disease had been communicated in the assumed attack and do not shed light on the question whether intercourse had occurred.

The results of the foregoing tests caused the pathologist to be certain that the victim had recently had sexual intercourse. Within his own expertise and based on studies reported in scientific works with which he was familiar, the pathologist gave as the most commonly accepted estimate that after sexual intercourse spermatozoa will remain motile within the vagina for as little as one half hour or as long as six hours. On the average, spermatozoa are motile for about three hours. Nonmotile sperm are usually found in the vagina for between seven and twelve hours after intercourse, but in some cases may be found as long as 48 hours afterwards. He opined that only in the most unusual cases would immotile sperm be found in the vagina much longer than that. Therefore, the pathologist concluded, it was most likely that the victim had had intercourse within the 48 hours prior to the examination.

The clothing worn by the victim and the accused was forwarded to a forensic chemist of unquestioned qualifications. Upon analysis, stains found in the crotch area of the victim's underpants and blue jeans proved to be caused by a mixture of spermatozoa, seminal fluids, and vaginal fluids of blood type A and B or A and AB. Stains found on the accused's underpants were

determined to be caused by seminal fluids and spermatozoa of blood type A. This led the chemist to conclude that the victim of the offense had type B blood and the assumed assailant had type A. Other competent evidence established that in fact the accused has type A blood and the victim type B. The victim's fiance has blood type O.

These indisputable facts, when coupled with the victim's unflinching denial that she had had intercourse during the prior two weeks, totally refute the accused's inherently implausible claim that he had only molested and had not raped her. Of course, the victim's clear and convincing testimony alone is sufficient to establish beyond a reasonable doubt that she had been brutally raped. As her testimony was corroborated by her fresh complaint and the observations of an eyewitness, it is obvious that the conviction of the accused was nearly inevitable. As the evidence available to the prosecution was so compelling, the trial defense counsel made his primary strategy one of making sure the accused received full due process, as well as attempting to have at least some of the more damaging evidence excluded on technical grounds, rather than directly attacking the merits of the case. In this he commendably and fully explored every possible avenue of defense and raised several procedural issues, many of which are reasserted and ably argued on appeal. The trial of the case extended over a period of a week, and the record consists of three volumes. As is to be anticipated in any trial of such duration, some error exists, but on the basis of the entire record, we are satisfied beyond a reasonable doubt that none of the errors, alone or cumulatively, was prejudicial to the substantial rights of the accused and that the trial was eminently fair. Nonetheless, several of the issues asserted on appeal warrant comment.

The first issue we address is that in which appellate defense counsel assert:

THE COURT–MARTIAL PANEL WAS IMPROPERLY SELECTED ON THE BASIS OF CRITERIA OTHER THAN THOSE SPECIFIED BY ARTICLE 25(d)(2), UCMJ.

The administrative procedures by which the members of this general court-martial were selected were substantially the same as those outlined in *United States v. Kemp*, 22 U.S.C.M.A. 152, 46 C.M.R. 152 (1973) and *United States v. Young*, 49 C.M.R. 133 (A.F. C.M.R.1974).

A pool of prospective court members was obtained as the result of a letter of the Commander of Kadena Air Base in which he requested subordinate and lateral commanders to nominate for him officers between the grades of second lieutenant and full colonel for appointment to courts-martial to be thereafter convened. The letter to those commanders emphasized that, as required by Article 25 of the Code, officers were to be selected on the basis of their age, education, training, experience, length of service and judicial temperament. He recognized that many of the best qualified prospective members would be key personnel of their respective units, but he emphasized the overriding importance of military justice and the inherent responsibility of the commanders for the administration thereof. In response to the letter, a large pool of nominated members was made available to the commander, and from this pool he, in conjunction with the staff judge advocate, selected the members who were appointed to the instant court-martial by the Commander, Fifth Air Force, who was located in Tokyo, Japan. This method of selection and appointment of court members, particularly by a convening authority located at a separate geographical location is specifically provided for in paragraph 36c, Manual for Courts-Martial, United States, 1969 (Rev.), and was approved in *United States v. Kemp*, supra.

█ The caveat in any such procedure, of course, is that the selection process must not arbitrarily exclude persons of particular grades, as all officers are eligible for appointment to courts-martial. See *United States v. Greene*, 20 U.S.C.M.A. 232, 43 C.M.R. 72 (1970). In *United States v. Daigle*, 23 U.S.C.M.A. 516, 50 C.M.R. 655, 1 M.J. 139 (1975), the United States Court of Mili-

tary Appeals found to be unacceptable a method of selection of court members which had the effect of excluding warrant officers and lieutenants. Facially, this might cast some doubt on the criterion established by the Okinawa commander, in that he requested nominations of members only in the grades of second lieutenant to full colonel, and did not solicit the names of warrant officers. However, we judicially note that after the enlisted grades of senior master sergeant and chief master sergeant (pay grades E–8 and E–9) were established in 1959, the United States Air Force no longer appointed or commissioned warrant officers. In the ensuing years those warrant officers who were on active duty have since, for the most part, left the service, and as of this date there are only 21 warrant officers remaining on active duty in the entire Air Force. Thus, it is apparent that warrant officers could not have been a significant segment of the officers assigned at Okinawa. Accordingly, no improper criteria with respect to the rank of proposed court members was involved in the selection process, and the administrative procedures involved do not violate the spirit or letter of Article 25. *United States v. Kemp*, supra; *United States v. Daigle*, supra. Accordingly, there is no merit in this aspect of the assigned error.

■ The real basis for the assertion as it was raised at trial is a claim that the composition of the court-martial is constitutionally infirm because there were no Negro or female officers included on the panel that was appointed. We find this aspect of the claimed error similarly without merit. Although it is true that the court as finally constituted did not include members of the Negro race or female officers, there was not the slightest showing that such persons had been systematically excluded in the selection process. It is significant, too, that no complaint about the composition of the court was interposed by trial defense counsel until he seemingly spontaneously moved for appropriate relief in this regard after the voir dire examination of the court members had begun and had been interrupted by an Article 39(a) session called for anoth-

er purpose. At the time of the motion he presented no evidence whatever to show any systematic exclusion but, in effect, merely observed that no Negroes or women were included in the panel, and that as far as he could determine only one Negro officer and one female officer were included among the pool of officers nominated by the various unit commanders.

■ Of course, neither the Constitution of the United States nor the Uniform Code of Military Justice requires that every economic, racial, or ethnic class, or persons of all military grades be appointed to a military jury. On the contrary, the law provides only that significant and identifiable groups may not be systematically excluded from the jury selection process. *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965); *United States v. Crawford*, 15 U.S.C.M.A. 31, 35 C.M.R. 3 (1964). As noted by Mr. Justice White in *Swain*, "[The] purposeful discrimination may not be assumed or merely asserted . . . it must be proven." 380 U.S. 202, at 205, 85 S.Ct. at 827. It is not sufficient to merely assert that there has been an apparent discrimination of Negro or female officers solely because none were shown to be appointed. The onus was upon the trial defense counsel to make some showing as to the validity of the claim; but no evidence whatever showing discrimination against any class of persons was presented. The process of selecting and appointing the court members in this case on its face reveals not the slightest suggestion that there was any illegality in the selection of the court members; accordingly, the assigned error is without merit.

In the next allegation of error we discuss, it is asserted:

"THE MILITARY JUDGE ERRED IN DENYING DEFENSE MOTIONS FOR ACCESS TO INFORMATION FROM THE OFFICIAL PERSONNEL RECORDS, MEDICAL RECORDS AND UNFAVORABLE INFORMATION FILES OF PROSPECTIVE COURT MEMBERS AND KEY WITNESSES."

■ Before reaching the basic question posed by this assigned error, we first note our factual disagreement with appellate defense counsel as to the assertion that records pertaining to the key witnesses were denied to the trial defense counsel. His original request for the matters alluded to in the assigned error called for the personnel records of all of the court members and key witnesses, and requested, particularly, the medical records of the victim of the offense. As we read the exhibits considered during argument on defense counsel's motion for appropriate relief at trial, the personnel and medical records of *the witnesses* were in fact furnished prior to trial. We attribute appellate defense counsel's continued assertion that those records were denied to the trial defense counsel's reference during his motion for the judge to order the production of the records of "all of the persons referred to" in his letter to the trial counsel requesting the documents. But his argument taken in its entire context makes it clear to us that he was actually referring only to his desire to see the personnel records of the appointed court members prior to their assembly. We have no doubt that the accused and his counsel were entitled to examine the personnel records and medical records of the complaining victim; however, we are also sure that as a matter of fact these documents were properly furnished.

■ The real issue, and it is an important one, is whether the trial counsel and military judge erred by not providing the defense with the personnel records of the appointed court members prior to trial. To better understand this issue, it is important that we set out the nature of the actual requests made by trial defense counsel. In his letter he requested that he be furnished with, "all personnel records within the control of the U.S. military or other governmental authorities concerning or relating to [the court members]," and that, "personnel type records is meant to include all information contained in unfavorable information files or other derogatory information repositories." As is readily apparent, the sweeping nature of the request amounts to an assertion that, as a part of pretrial preparation, counsel have an unlimited right to explore every facet of an appointed member's military career and personal life. We cannot agree with the underlying belief that by being appointed to a court-martial, a member loses his basic right to privacy.

■ The totality of the records maintained on its members by the Department of the Air Force pertain not only to their military status and qualifications, but extend to security clearance background investigations, to all facets of their preservice civilian life, and also include extensive private financial information and personal information relating to their families. Were we to grant the trial defense counsel's claim of right to such unbridled access to personal information of prospective court members, we would have to hold that as a matter of law the appointment of a person to a court-martial is tantamount to making his life an open book. This we decline to do. We do hold, however, that there is a more limited right of discovery of information concerning appointed court members. But we hasten to caution that counsel must appreciate their obligation to exercise discretion in this area and have due regard and sensitivity for prospective members' natural desire for and right to privacy. Requests for such information must not be made routinely, but only when clearly warranted by the circumstances and issues of a particular case.

■ The extent to which trial defense counsel is entitled to access to personnel records of appointed court members is one of first impression to this court, and we are unaware of any decisions of the United States Court of Military Appeals directly addressing this issue, although it is touched upon in *United States v. Franchia*, 13 U.S. C.M.A. 315, 32 C.M.R. 315 (1962). The only case directly in point that we are able to find is the decision of the Army Court of Military Review in *United States v. Perry*, 47 C.M.R. 89 (A.C.M.R.1973). There, our sister Court alluded to a limited right of discovery of information concerning pro-

spective court members, but found no prejudice, because although access to the military records of the members had been denied, the information sought had been made available during voir dire examination of the court members. The holding in that case illuminates the problem before us: the utility of counsel obtaining information about court members lies only in his preparing himself for the exercise of challenges for cause or peremptory challenges. We fully agree with the observations of the Army Court of Military Review in *Perry*, and, as will be discussed at greater length below, it is apparent that the accused in this case could not have been harmed by the denial of access to personnel records of court members, because the information sought was brought out from the members themselves prior to the exercise of challenges. We could, therefore, hold *United States v. Perry*, supra, to be dispositive of the issue before us. We are constrained, however, to express our own view of the scope and nature of the right to pretrial discovery of information concerning the appointed members of courts-martial.

The laws of many of the states provide for the release of lists of persons selected for jury duty prior to trial; the usual stated reason for such provisions is to provide counsel with a reasonable opportunity to conduct some pretrial investigation of jurors. By rule of court in some of the Federal circuits and by Federal statute a more limited right of access to jury lists exists. See 18 U.S.C. Section 3432; 28 U.S.C. Section 1867; *Stone v. United States*, 324 F.2d 804 (5th Cir. 1963); *United States v. Clarke*, 468 F.2d 890 (5th Cir. 1972); and, *Test v. United States*, 420 U.S. 28, 95 S.Ct. 749, 42 L.Ed.2d 786 (1975). Similarly, paragraph 44 *h* of the Manual for Courts-Martial, supra, provides for furnishing counsel with the orders appointing a court-martial. Such orders, of course, include the names, ranks, and unit of assignment of the appointed members. These provisions for the information as to the names of prospective jurors or court-martial members, do not, however, provide for any right of discovery of information concerning them.

It appears that in Federal courts, at least, the Government is under no obligation to furnish the defense with background information it might possess about those selected for jury duty. *Wagner v. United States*, 264 F.2d 524 (9th Cir. 1959) cert. denied, 360 U.S. 936, 79 S.Ct. 1459, 3 L.Ed.2d 1548; *Best v. United States*, 184 F.2d 131 (1st Cir. 1950) cert. denied, 340 U.S. 939, 71 S.Ct. 480, 95 L.Ed. 677; *United States v. Payseur*, 501 F.2d 966 (9th Cir. 1974). Of course, an attorney practicing in civilian criminal courts, would not, ordinarily, expect to be able to go to the prosecutor and be given information about prospective jurors. Rather the usual practice would be to go to the juror's employer, credit bureaus, police departments, schools, and other usual repositories of personal information and records. As these agencies make information available to members of the public in the usual course of their business for a variety of purposes, it is not surprising that there is no necessity to provide for a particular right of discovery on behalf of civilian defendants.

■ The military services, on the other hand, are unique in that the military department concerned not only selects the prospective court members, but is also the employer and record keeper for them. Yet, the Manual for Courts-Martial and the Uniform Code of Military Justice are silent with regard to any right of discovery of information concerning the members, even though the right of discovery prior to trials by court-martial is generally far broader than that available in civilian courts. *United States v. Franchia*, supra. But to say that the *Manual* and *Code* do not provide the tools for discovery of information about court members is not to say that the right does not exist. In our view, the entitlement to such information and the extent of that entitlement is provided for and determined by the interrelated provisions of the Freedom of Information Act, 5 U.S.Code, Section 552 and the Privacy Act of 1974, 5 U.S.Code, Section 552a, when read in conjunction with the American Bar Association's Standards for the Administration of Criminal Justice.

The Freedom of Information Act announces as the national policy that, to the greatest extent possible, records maintained by governmental agencies, including the Air Force, are to be furnished to all members of the public, unless specifically exempted by the statute. The Privacy Act, on the other hand, imposes penal sanctions for the unauthorized release of records pertaining to individuals without their consent unless such disclosure comes within one of the exemptions of that Act. The two statutes together are the best effort of the Congress to strike a workable balance between the public's right to have information about its Government while limiting the infringement on the inherent entitlement of individual members or employees of the Government to be free from unwarranted intrusions into their personal affairs.

The exemption with which we are most concerned from the requirement of the Freedom of Information Act that public records be made available is that there is no obligation to release:

> Personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy.

5 U.S.C. Section 552(b)(6).

 The wording of this exemption, taken literally, would seem to deny counsel the right to examine the personnel records of court members, because the phrase "personnel and medical files" seems to be disassociated from the further provision that implies that there are other exempted records which might, "constitute a clearly unwarranted invasion of personal privacy." However, in the *Department of the Air Force v. Rose*, 425 U.S. 352, 96 S.Ct. 1592, 1603, 48 L.Ed.2d 11 decided 21 April 1976, the Supreme Court of the United States construed the statute by reference to its legislative history and determined that the phrase "the disclosure of which would constitute a clearly unwarranted invasion of personal privacy" did not stand alone, but modified and qualified the exemption for personnel records as well as "similar files." Accordingly, personnel records are protected from release to trial defense counsel only to the extent that their disclosure impermissibly invades privacy.

That exemption from the Freedom of Information Act apart, when we turn to the Privacy Act we see there exempted from its prohibitions of disclosure, any records that are required to be released under the Freedom of Information Act. And more significantly, we see that the Privacy Act has two additional exemptions permitting disclosure of personal information that are especially significant to the issue before us. Such records may be released:

> 5 U.S.C., Section 552a(b)(1) To those officers and employees of the agency which maintains the record who have a need for the record in the performance of their duties; and

> \* \* \* \* \* \*

> 5 U.S.C., Section 552a(b)(11) Pursuant to the order of a court of competent jurisdiction.

Arguably, the first exemption set out above would seem to include at least any member of the defense team who is an Air Force officer or employee. He might logically contend that he has need for such records in the performance of the duty for which he has been appointed by the convening authority. Under the exemption, he would be entitled to the records of prospective court members regardless whether their personal privacy was thereby invaded. However, it is our view that whatever entitlement trial defense counsel might have under the statute, as a person performing official duties, is limited by his overall obligations as an attorney and officer of the court. The United States Air Force has adopted, for the purposes of the administration of military justice and the conduct of counsel, the provisions of the American Bar Association Standards for the Administration of Criminal Justice. Air Force Manual 111–1, Military Justice Guide, 2 July 1973, paragraph 1–11.

We find guidance for the extent and propriety of pretrial investigation of prospective court-martial members in Section 7.2(b), The Defense Function, and identical

language in Section 5.3(b) of The Prosecution Function, of the American Bar Association Standards:

> In those cases where it appears necessary to conduct a pretrial investigation of the background of jurors the lawyer should restrict himself to investigatory methods which will not harass or unnecessarily embarrass potential jurors *or invade their privacy* and, whenever possible, he should restrict his investigation to records and sources of information already in existence. (Emphasis supplied).

In the commentary accompanying the approved draft of the standards relating to the prosecution function and the defense function, it is said:

> Pretrial investigation of jurors may permit a more informed exercise of challenges than the voir dire affords and can be justified on that score. The practice of conducting out-of-court investigations of jurors presents serious problems, however. It may have a tendency to make jury service, already unpopular with many persons, even more onerous because of the fear of invasion of privacy. It may also have the appearance, even if unintended, of an effort to intimidate jurors. To minimize these risks, counsel should be careful to conduct investigations of jurors in a manner which avoids invasions of privacy.

■ The apparent similarity between the standards for the defense function and the language of the limitation of the Freedom of Information Act excluding from disclosure those personnel records which would constitute an "unwarranted invasion of privacy" leads us to conclude that the entitlement that appointed defense counsel has under the Privacy Act in the performance of official duties is similarly restricted to those records which would not unduly invade the privacy of the prospective court members. Accordingly, we hold that upon appropriate demand, trial defense counsel should be furnished those personnel records which the Freedom of Information Act requires to be released to any member of the public. Clearly, many items of information

from the personnel records of appointed members can be extracted and furnished to counsel without creating any serious threat to the right of privacy of the members.

Even with this limitation, the amount of information that may be made available to members of the public under Federal decisions and administrative rulings is rather broad. *United States Air Force v. Rose*, supra; *Getman v. NLRB*, 146 U.S.App.D.C. 209, 450 F.2d 670 (1971); *Robles v. Environmental Protection Agency*, 484 F.2d 843 (4th Cir. 1973). Information that has generally been held to be releasable under the Freedom of Information Act includes:

 a. date of birth,

 b. sex,

 c. race,

 d. marital status, including names, sex, age, number of dependents,

 e. home of record, at least of the member's original hometown,

 f. education and schooling: the major area of study, school, year of graduation, and degree received,

 g. present and past duty assignments, and

 h. awards and decorations received, and the character of discharges from military service that may have been received.

■ In our view such portions of the personnel records of prospective court members that are related solely to their personal and private affairs, such as financial records, personal history statements, decisions made with respect to the disposition of entitlements in the event of death or disability, and individualized reports of efficiency and training, should not ordinarily be released. Similarly, reports that contain derogatory information with respect to the member or his family should not be released as a matter of course. In this connection we parenthetically note that as the convening authority is required by Article 25 of the Code to select only the best qualified officers, it should not be expected that any significant unfavorable information would be located in the records of appointed members. In any event, whenever a question

arises as to the releasability of a particular record, trial defense counsel is not without recourse.

■ Air Force Regulation 30–4, Releasing Information and Providing Access to Personnel Records, dated 4 February 1976, provides an administrative means by which trial defense counsel can make an appropriate initial request for information that he seeks. When an administrative determination is adverse to him, he may renew his request for the information at trial. As we noted above, 5 U.S.Code, Section 552a(b)(11), provides that even though protected by the Privacy Act, personnel records may be disclosed, "pursuant to the order of a court of competent jurisdiction." In our view, the military judge of a court-martial has the authority to order the production of those records which he determines should be released and, for that purpose, is a court of competent jurisdiction within the meaning of the statute. When a motion for release of such records is made to the judge, the privileged character of the record should be respected until such time as, within his discretion, the military judge determines that the defense's need to the information outweighs the right to individual privacy of the prospective member. Accordingly, the military judge should examine the questioned record *in camera* before making his ruling. *Hamer v. United States*, 259 F.2d 274 (9 Cir. 1958) cert. denied, 359 U.S. 916, 79 S.Ct. 592, 3 L.Ed.2d 577; *Wagner v. United States*, 264 F.2d 524 (9th Cir. 1959); *United States v. Akers*, 18 Crim.L.Rptr. 287 (District of Columbia Superior Court, decided 24 November 1975).

Guided by the foregoing principles, we have examined the record of trial, and find that some records pertaining to court members should have been released to defense counsel prior to trial. In an offer of proof, trial defense counsel stated that his initial demand for all of the personnel records had been denied by the trial counsel and the personnel officer of the convening authority. As we have noted above, defense counsel did not have an entitlement to *all* of the records of the prospective members, and

this denial was proper. However, at a later time, defense counsel requested more limited information from the Director of Personnel, some of which should have been released. That officer declined to furnish defense counsel with *any* information from the personnel records of the members. As he made that administrative determination prior to the decision of the Supreme Court in *Department of the Air Force v. Rose*, supra, we cannot fault him as it was apparently the position of the Department at that time that all personnel records were privileged under the Freedom of Information Act. The contrary ruling by the Supreme Court indicates that the personnel officer was in error in his interpretation. We do not find, however, that the military judge abused his discretion in denying the motion for appropriate relief. In making that motion, trial defense counsel renewed his request in the same broad manner that would include *all* records pertaining to the members; for the military judge to have granted that motion would have been error. Adverting back to the erroneous decision of the personnel officer, however, we find no prejudice whatever.

As we have mentioned earlier, many states have adopted laws providing for the release of jury lists, but the legislative history of those provisions make clear their purpose was to expedite the jury selection process by eliminating many of the common questions that are asked on voir dire. In the case before us, trial defense counsel had ample opportunity, and indeed exercised it, to ask the court members themselves for the information which had not been made available to him prior to trial. As this information was thus available to him before his making a judgment on the exercise of challenges, the accused has not been harmed.

Somewhat related to the foregoing issue is the claim of error urged by appellate defense counsel that:

"DEFENSE VOIR DIRE WAS IMPROPERLY RESTRICTED ON VITAL ISSUES ON POSSIBLE RACIAL, RELIGIOUS, AND CULTURAL BIAS."

In their brief, and during oral argument in support of this issue, appellate defense counsel point to the many occasions during defense voir dire on which the military judge, often without prior objection by trial counsel, interrupted defense counsel and ruled particular areas into which his inquiry was leading were irrelevant. Complaint is made that the defense was thus totally "chilled" from delving into such areas as the court members' attitude toward the integration of public schools, with special emphasis being placed on the court members' attitude toward the possibility of their own children being bused away from their neighborhood in order to achieve integration. The military judge also restrained inquiry into the members' perception of the current social attitude among military officers toward interracial marriages, their perception as to which races have the higher rate of involvement in crime, and their impressions of a motion picture about interracial marriage "Guess Who's Coming To Dinner." Similarly, complaint is made that the military judge was reluctant to permit inquiry into the partisan political preferences of the members, the economic strata in which they were raised, and the attitudes of their parents with respect to racial prejudice. With respect to one member, concerning whom an additional assignment of error is made, complaint is made that defense counsel was prevented from fully exploring the beliefs of the Mormon faith.

Beyond question, trial defense counsel is entitled to wide latitude during voir dire examination. Paragraphs 62e and 62h of the Manual for Courts-Martial, supra, in combination, give to counsel for both sides the right to question members of the court concerning any possible ground for challenge for cause, and "any other matters which have a substantial or direct bearing on the rights of the accused or the Government to a fair and impartial court." Concerning this right, the Court of Military Appeals said in *United States v. Parker*, 6 U.S.C.M.A. 274, 19 C.M.R. 400 (1955) and repeated in *United States v. Huntsman*, 22 U.S.C.M.A. 100, 46 C.M.R. 100 (1973):

The accused should be allowed considerable latitude in examining members so as to be in a position intelligently and wisely to exercise a challenge for cause or a peremptory challenge. Accordingly, when there is a fair doubt as to the propriety of any question, it is better to allow it to be answered. While materiality and relevancy must always be considered to keep the examination within bounds, they should be interpreted in a light favorable to the accused. If there is doubt in the mind of the law officer as to the propriety and good faith of the questions, he can and should require the examiner to disclose the relevancy of the examination, rather than merely forbid the inquiry.

19 C.M.R. 400 at page 405; 46 C.M.R. 100 at page 101.

We are especially mindful, as in this case the accused is a black airman and the victim a white female airman, that inquiry into the racial attitudes of the members was entirely relevant and proper. *Ham v. South Carolina*, 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973); *Aldridge v. United States*, 283 U.S. 308, 51 S.Ct. 470, 75 L.Ed. 1054 (1931). As has often been noted in Federal cases, an accused has the right to probe for hidden prejudices of the jurors. See *United States v. Napoleone*, 349 F.2d 350 (3d Cir. 1965). At the same time, however, we are also mindful that the military judge is vested with wide discretion as to questions which must be answered by jurors on voir dire. *United States v. Parker*, supra; *United States v. Huntsman*, supra.

As Chief Judge Fletcher noted in *United States v. Graves*, 23 U.S.C.M.A. 434, 50 C.M.R. 393, 1 M.J. 50 (1975), the military judge of a court-martial is more than a mere referee. While he should permit wide latitude to counsel in voir dire examination, his is the primary responsibility for controlling the scope of the examination, and he must not permit unreasonable repetition or permit counsel to pursue clearly irrelevant lines of inquiry. See ABA Standards, The Function of the Trial Judge, Section 5.5. The rule of law which we, as an appellate

court, are to follow is that we should reverse only if it is shown that the military judge clearly abused his discretion in a manner prejudicial to the accused. *United States v. Huntsman*, supra. In measuring the exercise of discretion, we are guided in part by the ABA Standards, The Function of the Trial Judge, Section 5.5, that:

> The judge should initiate the voir dire examination . . . by putting to the prospective jurors questions touching their qualifications, including impartiality, to serve as jurors in the case. The judge should also *permit such additional questions by defendant or his attorney and the prosecutor as he deems reasonable and proper.* (Emphasis supplied.)

Related to this standard, is the ABA Standards, The Defense Function, Section 7.2:

> [T]he opportunity to question jurors should be used solely to obtain information for the intelligent exercise of challenges. A lawyer should not purposely use the voir dire to present factual matter which he knows will not be admissible at trial or to argue his case to the jury.

■ It is with the foregoing principles in mind that we have carefully scrutinized the voir dire examination conducted in this case. There were but eight members when the court assembled. Their voir dire examination lasted a full day of court and is reported in nearly 100 pages of the record. It is in this factual context that we examine the above recited areas of inquiry into which the accused was assertedly improperly restrained. The members were questioned both collectively and individually. During this prolonged interrogation, each of the members was intensively questioned on a vast range of subjects, and any possibility of bias or prejudice was fully explored. While it is true that on occasion some of the questions posed by defense counsel were interrupted by the military judge, as a matter of fact nearly all of the questions posed by trial defense counsel were permitted. Many of the members were asked and gave answers with respect to the specific areas of inquiry referred to in the argument by appellate defense coun-

sel. Although the military judge did restrain trial defense counsel in the voir dire examination, we find the extent of that restraint to have been entirely reasonable. The broad scope of the voir dire examination that the military judge did permit fully establishes that at its conclusion, trial defense counsel was well able, and in fact did, intelligently exercise his right to assert challenges for cause and peremptory challenges. Accordingly, we find that the military judge did not abuse his discretion, or indeed his duty to control the voir dire examination, and the assigned error is without merit.

■ In a further assignment of error, it is asserted that the military judge erred in not sustaining the challenge for cause of one of the members who belonged to the Church of Jesus Christ of Latter Day Saints (Mormon). The challenge was made because the member acknowledged that he accepted the teachings of the Mormon faith and said the tenets of that faith preclude Negroes from being admitted to the priesthood and deny all religious ceremony to interracial marriages. These beliefs are inherently discriminatory against Negroes, and it was urged at trial that the member was therefore necessarily or at least inferentially biased against the accused. It is urged on appeal that the military judge abused his discretion in denying the challenge for cause. We disagree.

While acknowledging that these were the teachings of his church, the challenged member indicated that he was troubled with them and was aware that it was a subject of much criticism by non-Mormons. With respect to his individual views, however, he felt that interracial marriages were something "they had to decide for themselves," and indicated he personally had some very good friends who had made mixed marriages. He said that he personally would have no qualms whatever about his children attending an integrated school and that as far as he was concerned the sole test for ability was whether a person was qualified. Taken as a whole, we are satisfied that the teachings of the Mormon faith

were not carried over into the member's personal attitudes or prejudices.

As the Constitution proscribes religious tests for any office, including that of a juror, it cannot be held that membership in any religious group or association in itself can constitute a ground for challenge for cause. See *Malvo v. J. C. Penney*, 512 P.2d 575 (Alaska 1973), Annotated in 54 A.L.R.2d 1204. A member's religious beliefs are an appropriate subject of inquiry, but only to the extent to which they cast light on his *personal* fairness and impartiality. Again, a challenge for cause is addressed to the sound discretion of the military judge. The burden of maintaining the challenge rests on the challenging party. Manual for Courts-Martial, supra, paragraph 62*h*. In exercising this discretion, the military judge should ordinarily give considerable weight to disclaimers made by a challenged court member, as he is, after all, expected to faithfully and impartially perform his duties. *United States v. Jarvis*, 22 U.S.C.M.A. 260, 46 C.M.R. 260 (1973); *United States v. Wright*, 47 C.M.R. 637 (A.F.C.M.R.1973) pet. denied, 48 C.M.R. 1000. There is simply no showing in the record before us that the member was biased against the accused. We find, therefore, that the military judge did not abuse his discretion in denying the challenge for cause.

In the next assigned error we address, appellate defense counsel assert that the military judge erred in not compelling the attendance, for the purposes of cross-examination, of the laboratory technician who performed the "wet mount" sperm motility test of the specimens taken from the vagina of the victim. To place this issue in proper perspective, we note that prior to trial, defense counsel had requested the attendance of this witness, Specialist Garcia, but had withdrawn the request when informed that the written laboratory report form prepared by him would be introduced into evidence by the prosecution. At a very early stage of the trial, defense counsel informed the military judge that he had withdrawn the request, and would not pursue it further.

However, on the fourth day of the trial, defense counsel vigorously renewed his demand for his presence. The record indicates that in the interim Garcia had been separated from the United States Army and had returned to the United States as a civilian. It was believed that he had obtained employment with the Air Force hospital in San Antonio, Texas. But the whereabouts of Mr. Garcia were at best uncertain. Trial defense counsel related that he had been unable to talk to Mr. Garcia by telephone to determine his expected testimony, because several calls made to hospitals in the San Antonio area failed to disclose any record of him. The military judge denied the compulsory attendance of Mr. Garcia or the taking of his deposition.

Prior to the request for Garcia's presence, the military judge had properly admitted the laboratory report of the sperm motility test prepared by him, as a record accomplished in the ordinary course of business. *United States v. Evans*, 21 U.S.C.M.A. 579, 45 C.M.R. 353 (1972); *United States v. Miller*, 23 U.S.C.M.A. 247, 49 C.M.R. 380 (1974). Appellate defense counsel argue that while those cases make it unnecessary to initially call as a witness the person who prepared a laboratory report as a foundation for its admissibility, they also provide an unqualified right for the defense to have his presence in court for the purpose of cross-examination. In our view, counsel misconstrue the import of the language in *Evans* that "if the accused 'wishes to do so, he may have the analyst summoned' to examine him as to his competency and as to the regularity of the procedure employed." *United States v. Evans*, supra, 45 C.M.R. 353 at 356. That language was clarified in *Miller* as follows:

"The point of the statement is that as the business entry is admissible without the in-person testimony of the declarant, the accused can assert his right to cross-examination by calling the declarant as a witness and, as provided in Rule 806 of the proposed Federal Rules of Evidence, 'examine him on the statement *as if un-*

*der cross-examination.'*" (Emphasis supplied.)

49 C.M.R. 380 at 383.

■ It is clear to us from the foregoing language that the Court of Military Appeals did not allude to an absolute right to compel the attendance of the laboratory technician; to do so, for practical purposes, would have negated the advanced view of hearsay evidence shown in *Evans.* Rather, in light of the reference to Rule 806 of the Federal Rules of Evidence, it is clear the import of the language is that under the usual rules for compelling attendance of witnesses, counsel may seek the presence of the witness, and if successful, shall be entitled to cross-examine him as if he had been called by the opposite party.

The standard to be followed by convening authorities and military judges in ruling upon requests for the attendance of witnesses was enunciated by the Court of Military Appeals, in language incorporated verbatim into the current text of paragraph 115a of the Manual, in *United States v. Sweeney,* 14 U.S.C.M.A. 599, 34 C.M.R. 379 (1964):

> Each case must be decided on an ad hoc basis in which the materiality of the testimony and *its relevance to the guilt or innocence of the accused,* together with the relative responsibilities of the parties concerned, is weighed against the equities of the situation. Testimony on the merits differs widely from that in extenuation and mitigation, and our holding in this case is pertinent only to that issue.

In its reference to "the relative responsibilities of the parties" and the "equities of the situation", the Court was obviously alluding to factors in addition to materiality, such as the adequacy of the showing that the expected testimony is necessary, the timeliness of the request, and the cumulative nature of the evidence desired. See *United States v. Young,* 49 C.M.R. 133 (1974). We need not consider whether these other factors justify the refusal to call Garcia. In our view, trial defense counsel, and appellate defense counsel failed to cross the first and essential requirement for compelling the attendance of an absent witness, that is, it must be shown that the testimony desired would be *material.*

■ The first two reasons put forth at trial and on appeal for the materiality of Garcia's testimony were that his presence was necessary to rebut the prosecution's evidence concerning the chain of custody of the specimen and the competency and regularity of the procedures he followed. We find no substance whatever to these contentions. The totality of the evidence pertaining to the laboratory exhibits contained in the record of trial convinces us beyond question that the specimen examined and reported upon by Garcia was the one taken from the victim. Controls exercised over all of the specimens were near absolute, and the urgency with which Garcia's test was to be conducted dispel the notion that somehow he received a vaginal specimen from some other person. The fact that one of the several control documents was irregularly prepared appears to us to be nothing more than what was once described by a Federal Court of Appeals as amounting "to no more than a bubble in the record." *Shannon v. United States,* 263 F.2d 596 (9th Cir. 1959).

■ We find to be similarly specious the assertion that the laboratory techniques used by Garcia needed to be examined. The fact that spermatozoa was present in the vaginal specimen taken from the victim was established with absolute certainty. His test was to determine only whether the sperm he observed was motile. But, according to the pathologist, that test consisted of nothing more than microscopically observing sperm cells to see if the flagella or "little tails" attached to the sperm cells were moving. This simple kind of visual observation would obviously not provide a fertile field for cross-examination; and his compulsory attendance cannot be justified for that purpose.

■ The main argument asserted on appeal in support of the materiality of Garcia's testimony is not related to the chain of custody and adequacy of the tests, as con-

tended at trial. Rather, it is now urged that the precise time at which the test was conducted by Garcia was of utmost importance, and was known only to him. As will be recalled, spermatozoa become immotile the longer they remain in the vagina. It obviously follows that if Garcia observed the specimen furnished to him immediately upon its receipt, the sperm would be more likely to be motile, while if he waited until just before the specimens were seen by the pathologist in the morning, the spermatozoa would be less likely to be motile. Appellate government counsel point out, and we are inclined to agree with them, that if the motility test was conducted promptly, evidence that the sperm was then immotile would, if anything, be damaging to the prosecution, as it would render it less likely that the sperm came from the accused. Appellate defense counsel, however, argue that if the court believed that Garcia was dilatory in performing the test they might have inferred that the sperm would be immotile in any event and could be that of either the accused or the victim's fiance. While we have difficulty attributing the same significance to the timing of the test as does appellate defense counsel, we need not fully analyze his position, for to us the evidence in the record makes it crystal clear that Garcia in fact performed his test promptly.

The presumption that government employees properly carry out their assigned functions alone gives us reasonable assurance that the test was done soon after the specimen was received by Garcia; the hospital protocol made this a requirement. The testimony of the various hospital personnel who did testify show that the specimens were handled by all concerned with considerable dispatch; this was, after all, an unusual occurrence and all of the circumstances described by the witnesses show an insistence upon timeliness. Those circumstances apart, however, we find other competent evidence establishing that the test was conducted promptly. It will be recalled that the gynecologist testified that it was reported to him that immotile sperm had been found *while he was still conduct-*

*ing his examination.* His testimony in this regard, was of course, hearsay, and was incompetent to show the truth of the assertion that the sperm was immotile. However, his testimony in this regard falls into what is usually described as an "apparent" exception to the hearsay rule. His testimony is competent to show that as a matter of fact the report was made to him at the time he said it was. See paragraph 139, Manual for Courts-Martial, supra; Rule 801, Federal Rules of Evidence. As the fact of the test was made known to the gynecologist at the time, it necessarily follows that Garcia already had conducted the test. Thus, Garcia's testimony in this regard would have no materiality. Accordingly, we are satisfied that this assigned error has no merit.

In a further assignment of error, appellate defense counsel aver that the military judge erred in denying a defense request to require the attendance at trial, or the depositions of, the accused's father, mother, sister, and a former squadron commander. He made a similar request with respect to the fiance of the victim, who had since been transferred to the United States. In his motion to compel the attendance of these witnesses, trial defense counsel stated that the first four were expected to give testimony that would go to the "core of the defense." Specifically, he asserted, and the trial counsel later stipulated, that the accused was, and had always had a reputation for being, a very peaceable and nonviolent person.

█ We are mindful, of course, that when the materiality of expected testimony is shown, the defense has a right equal to that of the prosecution, to obtain the attendance of witnesses. Paragraph 115a, Manual, supra. And it is for the defense to decide who those witnesses shall be. *United States v. Sweeney,* supra. We are also mindful that the Court of Military Appeals has consistently been more liberal in requiring the attendance of witnesses who are members of the armed forces and therefore more amenable to military orders and travel arrangements. *United States v. Manos,* 17 U.S.C.M.A. 10, 37 C.M.R. 274 (1967);

*United States v. Carpenter,* 24 U.S.C.M.A. 210, 51 C.M.R. 507, 1 M.J. 384 (1976). On the other hand, we must also be guided by the observation of the Court in *Sweeney* that:

> This opinion is not to be construed as granting *carte blanche* authority for the issuance of subpoenas in all cases. Each request should be carefully considered to prevent a useless or abusive issuance of process.

34 C.M.R. 379 at page 386.

 In view of the caveat in *Sweeney,* the military judge may well have considered the testimony of the three members of the accused's family to be cumulative and unnecessary. We are not so sure that he was correct in denying the attendance of the accused's former squadron commander, in view of the recent ruling of the Court in *Carpenter.* Similarly, the testimony of the victim's fiance may have been material with respect to her prior chastity, although the degree of materiality is certainly attenuated by her candid admissions of her prior sexual experiences, which had been made during the pretrial Article 32 investigation. But, even if we were to assume that the military judge erred in denying the request for the appearance or depositions of these witnesses, we would necessarily test that error for prejudice.

In the final analysis, the testimony of the members of the accused's family and former squadron commander that the accused had always been a peaceable and nonviolent person, could not have had the slightest effect upon the findings of the court. The evidence compellingly established that the victim was violently and brutally attacked, and the accused admitted that he had attacked her. Thus, his former peaceable traits were of no factual significance with respect to his guilt, at least of the offense he admitted. *United States v. McElhinney,* 21 U.S.C.M.A. 436, 45 C.M.R. 210 (1972). Similarly, we are convinced beyond reasonable doubt that the denial of the attendance of the victim's fiance could not have harmed the substantial rights of the ac-

cused. It is doubtful that his testimony would have added anything more than what she had admitted herself before the court. His testimony as to his prior adultery with her and other knowledge he may have had concerning sexual misbehavior on her part would necessarily be relevant only with respect to the issues of her credibility and want of consent. These issues were but minimally raised by the evidence, as her testimony in these regards was compellingly corroborated by other direct and circumstantial evidence and scientifically established facts. *United States v. Jones,* 21 U.S.C.M.A. 215, 44 C.M.R. 269 (1972).

 The three remaining errors assigned and briefed by appellate defense counsel are without merit and require very little discussion. It is averred that the record of trial was improperly authenticated by the assistant trial counsel, who was shown by the record originally forwarded to this Court to be absent for substantial periods during the trial. Certificates of correction of the record obtained by appellate government counsel establish that the original record was in error. On several occasions during this lengthy trial, the assistant trial counsel did leave the courtroom for brief periods, but the court reporter had failed to note in the record his return. We judicially note that the military judge who sat on this case was stationed in Bangkok, Thailand, and the appointed trial counsel stationed in the Philippines; they cannot be expected to have been present in Okinawa when the record of trial was completed. See *United States v. Cruz-Rijos,* 1 M.J. 429 (25 June 1976). The Manual for Courts-Martial, supra, paragraph 82f authorizes the assistant trial counsel, who was present at the conclusion of the trial, to authenticate the record under these circumstances. His intermittent and brief absences had no effect on this authority, particularly as there has never been made the slightest intimation that the record of trial is not authentic, correct, and accurate. *United States v. Cruz-Rijos,* supra; *United States*

*v. Dunn,* 44 C.M.R. 929 (A.F.C.M.R.1972) pet. denied, 44 C.M.R. 939.

 We have examined the review of the staff judge advocate, and find the complaints made about it to be without merit. It contains an extremely fair summarization of all the pertinent evidence, discusses all of the relevant legal issues, gives sound reasons for the conclusions therein, and is sufficient to permit the convening authority to exercise his responsibilities. *United States v. Foti,* 12 U.S.C.M.A. 303, 30 C.M.R. 303 (1961); *United States v. Lindsey,* 23 U.S.C.M.A. 9, 48 C.M.R. 265 (1974). We are satisfied, too, that the convening authority did not act improperly in taking his action, prior to receiving trial defense counsel's comments on the review of the staff judge advocate as provided in *United States v. Goode,* 23 U.S.C.M.A. 367, 50 C.M.R. 1, 1 M.J. 3 (1975), in order to assure that the accused was not denied the speedy post-trial review and action mandated by United States Court of Military Appeals in *United States v. Dunlap,* 23 U.S.C.M.A. 135, 48 C.M.R. 751 (1974). Our decision in *United States v. Veilleux,* No. 21937, 1 M.J. 811 (A.F.C.M.R. 26 February 1976), pet. denied, 11 June 1976, is dispositive of this contention.

 During oral argument, appellate defense counsel additionally asserted that the trial counsel erred in his argument on the sentence by urging that the court could consider the extent to which their sentence would serve to deter others from committing similar offenses. See *United States v. Mosely,* 1 M.J. 350 (1976) and *United States v. Miller,* 1 M.J. 357 (1976). We agreed to consider that issue, with the concurrence of appellate government counsel, and have carefully examined the trial counsel's argument. We are satisfied that while he did make reference to the concept of general deterrence as being one of the circumstances to be taken into account in arriving at an *appropriate* sentence, the real thrust of his argument was that a severe punishment should be imposed because of the inherent seriousness of the offense and because of the vile affront to the victim. He did not urge the concept of general deterrence as an aggravating circumstance justifying the imposition of a more severe sentence upon the accused than might otherwise be adjudged. He asked only that the court take all the circumstances of the case into account at arriving at an *appropriate* sentence. See *United States v. Davic* No. S24354, 1 M.J. 865 (A.F.C.M.R. 18 May 1976). Even if we were to assume that the argument of the trial counsel was impermissible, we would nonetheless find no prejudice to the substantial rights of the accused. The argument was apparently not considered to be particularly egregious at trial, for no objection to it was made by defense counsel. *United States v. Wood,* 18 U.S.C.M.A. 291, 40 C.M.R. 3 (1969). In any event, the sentence imposed, which included confinement at hard labor for three years, is so substantially less than the maximum imposable punishment of life imprisonment, that it is apparent the trial counsel's occasional references to the need for deterrence did not have a substantial impact on the court-martial. *United States v. Bates,* No. 21986, 1 M.J. 841 (A.F.C.M.R. 12 April 1976).

For the reasons stated, the findings and sentence are correct in law and fact, and they are

Affirmed.

ORSER and SANDERS, Judges, concur.

HERMAN, Judge, not participating.