UNITED STATES, Appellee

v.

ROBERT L. PARKER, Private E–2, U. S. Army,
Appellant

6 USCMA 274, 19 CMR 400

275

276

*Captain Frank C. Stetson* argued the cause for Appellant, Accused. With him on the brief was *Lieutenant Colonel Joseph L. Chalk.*

*First Lieutenant Lewis W. Evans* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Thomas J. Newton* and *Major Clayton B. Tasker.*

## Opinion of the Court

GEORGE W. LATIMER, Judge:

The accused was convicted by general court-martial of three offenses of burglary, in violation of Article 129, Uniform Code of Military Justice, 50 USC § 723, and two offenses in violation of Article 134, Uniform Code of Military Justice, 50 USC § 728, one of indecent assault, the other of indecent liberties with a female less than 16 years of age. He was sentenced to dishonorable discharge, total forfeitures, and confinement for 42 years. The convening authority approved the findings and sentence. The board of review affirmed, but reduced the term of confinement to 30 years. We granted the accused's petition for review under Article 67 of the Code, 50 USC § 654, to consider the following issues, which we will treat in reverse order:

"Whether the rulings by the law officer on the questions propounded by defense counsel on *voir dire* were correct.

"Whether the evidence was sufficient to allow receipt of the alleged confession into evidence."

At about 3:30 a.m. on July 13, 1954, a wife of a serviceman stationed at Fort Campbell, Kentucky, awoke to discover that a person unknown to her was fondling her body in a manner which, under the circumstances, can best be described as indecent. When she sounded an alarm, her unknown assailant fled. She and her husband occupied quarters on the post, and prior to retiring for the night, they had checked all the door and window screens to insure they were closed and secure.

At about 1:00 a.m. on July 22, 1954, a daughter of a Warrant Officer was awakened by a sound in the hall of their quarters at the same post. The young lady stepped into the hall to investigate, and there she observed the accused. When she turned on the lights and screamed, he fled through the back door of the apartment. After the incident, it was discovered that a screen had been pried away from a window in the kitchen.

A short time later, a 14-year-old daughter of a Sergeant, who also occupied family quarters at the same Fort, awoke to discover that she was no longer occupying her bed alone. Her intruder had his hand on her shoulder. When she screamed for her parents, the person, later identified as the accused, departed in haste. Although the Sergeant had tightened the screens on all of the windows of his quarters during the afternoon of July 21, 1954, he found after this incident that one of the kitchen window screens had been slashed and torn loose at one corner. After this incident, the military police were summoned. Within a few minutes, they found the accused hiding underneath a nearby house.

On July 23, 1954, the day following his apprehension, the accused was ad-

**277**

vised of his rights under Article 31 of the Code, 50 USC § 602, by a Criminal Investigation Detachment agent and then interrogated. Thereafter, he executed a statement in which he said that, because he was going on leave and needed money, he decided to burglarize some of the apartments occupied by servicemen and their families. He also admitted the sexual offenses, saying that in each instance his sexual desires were not aroused until after he had discovered the presence of sleeping women in the various quarters he entered.

## II

The sole objection lodged against the confession, which is pertinent to our inquiry, questioned the adequacy of the corpus delicti to permit admission of the confession. Narrowed to the issues of this case, appellate defense counsel does not question the sufficiency of the evidence to establish the probable existence of each element of the offenses of indecent assault and the taking of indecent liberties. He does urge, however, that the evidence, aliunde the confession, establishes that the accused intended only to commit the various sexual offenses at the time he broke and entered, and therefore negates the probability that he entered with an intent to commit larceny. Because the accused was charged with that intent, he would have us conclude that the corpus delicti evidence is insufficient as to the burglary offenses. This argument is not well founded.

In United States v. Morris, 6 USCMA 108, 19 CMR 234, we held that, for corpus delicti purposes, the probable existence of an intent to commit larceny may properly be inferred from an unexplained breaking and entering in the nighttime, even though the evidence tends to show the possible existence of another intent. We believe that case controls this issue. However, because there is stronger evidence of sexual

intentions in this instance, we refer to a few additional authorities.

To make out the offense of burglary, it is essential that the specific intent alleged, in this case an intent to commit larceny, exist at the time of the breaking and entering. Manual for Courts-Martial, United States, 1951, paragraph 208, page 374. It can be conceded that the facts shown here would permit a court-martial to infer that the accused, at the time of entry, intended to commit a sexual crime. But that does not exclude an intent to commit larceny. The authorities generally support the theory that both intents may be inferred from just such a showing as was made here.

In State v. Woodruff, 208 Iowa 236, 225 NW 254 (1929), it was shown that the defendant, while sober, removed his cap, coat, and trousers, and then broke and entered into a dwelling occupied by a mother and two young daughters. He left the house without taking anything, but was apprehended as he was departing. The Iowa Supreme Court concluded the evidence was sufficient to go to the jury on the issue of whether he intended to commit larceny.

In People v. Soto, 53 Cal 415 (1879), the defendant, at a late hour of the night, entered a bedroom in which a woman was asleep. He seized her by the throat and threw himself across the bed. When she cried out, he fled from the building without taking anything. The woman testified that, in her belief, he intended to have sexual intercourse with her. The California court held that the evidence sustained the jury's verdict of guilty of burglary with intent to commit larceny, although concededly, the inference of another intent was possible.

In State v. Worthen, 111 Iowa 267, 82 NW 910 (1900), the defendant was found, at night, in a room occupied by a woman with his hand upon her person. When she cried out, he escaped, taking nothing. Here again, the evi-

278

dence was found sufficient to sustain a conviction for burglary with intent to commit larceny.

If, then, evidence of an unexplained breaking and entering into a dwelling house, during the nighttime, is sufficient to support a jury finding of burglary with intent to commit larceny, under the circumstances of those cases, we are sure the evidence in this case is sufficient to show the probable existence of that intent. More than that is not required for corpus delicti purposes.

### III

Prior to arraignment, defense counsel asked a number of questions of the various court-martial members. As we interpret his line of questioning, we conclude he was principally seeking to determine whether, because the victims were Caucasians and the accused a Negro, the court members would be prejudiced against the accused. The law officer offered defense counsel an opportunity to examine in that area, but he refused to allow counsel to probe in some other fields. The question here raised is whether he erred in certain of his rulings, and thereby unduly restricted the preliminary examination. The rulings will be grouped and considered in connection with the subjects to which they pertain.

Before discussing the specific questions involved, and because law officers can determine the extent of the voir dire, we believe a few observations on the preliminary examination of court members might be helpful to them. The Manual for Courts-Martial, United States, 1951, paragraph 62b, authorizes the questioning of court members by counsel. It does not set out specifically the methods which may be employed, but Rule 24a, Federal Rules of Criminal Procedure, offers a satisfactory solution. The rule provides as follows:

"RULE 24. TRIAL JURORS

"(a) Examination. The court may permit the defendant or his attorney and the attorney for the government to conduct the examination of prospective jurors or may itself conduct the examination. In the latter event the court shall permit the defendant or his attorney and the attorney for the government to supplement the examination by such further inquiry as it deems proper or shall itself submit to the prospective jurors such additional questions by the parties or their attorneys as it deems proper."

When a member is examined with a view to challenge, it is to be remembered that he may be asked any pertinent question tending to establish a disqualification for duty on the court. Statutory disqualifications, implied bias, actual bias, or other matters which have some substantial and direct bearing on an accused's right to an impartial court, are all proper subjects of inquiry. The accused should be allowed considerable latitude in examining members so as to be in a position intelligently and wisely to exercise a challenge for cause or a peremptory challenge. Accordingly, when there is a fair doubt as to the propriety of any question, it is better to allow it to be answered. While materiality and relevancy must always be considered to keep the examination within bounds, they should be interpreted in a light favorable to the accused. If there is doubt in the mind of the law officer as to the propriety and good faith of the questions, he can and should require the examiner to disclose the relevancy of the examination, rather than merely forbid the inquiry.

### IV

The first two questions in dispute are as follows:

"DEFENSE COUNSEL: Is there any member of the court who would, though finding any reasonable doubt

**279**

in his mind as to the guilt of the accused, nevertheless find the accused guilty?

"LAW OFFICER: That question is improper because the court will be instructed on reasonable doubt at the time the law officer gives his instruction. That question will not be answered.

"DEFENSE COUNSEL: Very well, is there any member of the court who, while being instructed on matters given by the law officer, would feel that he personally is privileged to go ahead and arrive at a conclusion disregarding the instructions given by the law officer?

"LAW OFFICER: That again is an improper question, and the court will not have to answer the question."

Perhaps as to these particular questions, the law officer would have been wiser had he permitted them to be answered, although negative responses were inevitable. But one ▆▆▆▆ ■ of the well-recognized rules of criminal jurisprudence is that wide discretion is vested in trial judges as to questions which must be answered by jurors on voir dire. Appellate courts should reverse only when a clear abuse of discretion, prejudicial to a defendant, is shown. Conceding that the purposes of voir dire are to determine whether individual jurors can fairly and impartially try the issues, and to lay a foundation so that peremptory challenges can be wisely exercised, those purposes do not permit the examination to range through fields as wide as the imagination of counsel. Because bias and prejudice can be conjured up from many imaginary sources and because peremptory challenges are uncontrolled except as to number, the areas in which counsel seek to question must be subject to close supervision by the law officer.

There are literally hundreds of cases dealing with the nature, extent, and character of the preliminary examination of jurors, and it is ▆▆▆▆ ■ practicable to group only a few of them in general categories. On the one hand, it has been held by several Federal courts that questions, in many respects similar to the ones involved here, need not be answered. Interrogation of jurors as to how they would vote if they entertained a reasonable doubt of guilt at the close of the case, or if the testimony turned out to be equally balanced, has been frowned upon, because, it is said, questions of that sort merely trifle with the time and procedure of the court. The assumption underlying these holdings is that jurors are presumed to obey the instructions given them concerning such matters as the presumption of innocence, the burden of proof, and reasonable doubt. Christianson v. United States, 290 Fed 962 (CA 6th Cir) (1923); Kurczak v. United States, 14 F2d 109, 110 (CA 6th Cir) (1926); Bonness v. United States, 20 F2d 754 (CA 9th Cir) (1927).

One state case which sets out succinctly why questions framed along the line of the two in issue need not be answered is Hughes v. State, 109 Wis 397, 85 NW 333, 335 (1901). It was there stated:

"Several jurors were asked whether, in case of a reasonable doubt in their minds as to the guilt of the accused, they would give him the benefit of such doubt, and whether they would give the accused the benefit of such a doubt as quickly as if the accused were a highly respectable gentleman; also whether they would be prejudiced against the accused if it developed that he was living with a woman not his wife, and whether they would follow their consciences or the judge's instructions; and other similar questions were put, all of which the court finally ruled out. There was no error in these rulings. While the questions might, perhaps, have been properly allowed,

because the trial court has a large discretion as to the selection of a jury (Sutton v. Fox, 55 Wis 531, 13 NW 477), the ruling of the court in refusing to allow them was clearly not error. They were questions which practically asked the juryman what he would or would not do under a supposed state of facts, and such questions may properly be ruled out. Thomp. Trials, § 102."

On the other hand, certain state jurisdictions appear to take the view that when a particular juror has some hostility to the particular type of crime or any matter to be offered in defense, it is desirable to permit inquiry to be made as to his willingness to accord to an accused the presumption of innocence and the benefit of reasonable doubt. Carnaggio v. State, 143 Miss 694, 109 So 732 (1926), (juror abhorred liquor offenses and thought constitutional rights were mere technicalities); State v. Vogan, 56 Kan 61, 42 Pac 352 (1895), (juror prejudiced against anyone charged with rape); and Jones v. State, 60 Tex Crim 139, 131 SW 572 (1910), (juror insisted evidence of insanity must be overwhelming before he would acquit, where the law of the jurisdiction required only a preponderance of the testimony). In the latter case, the Court of Criminal Appeals for the State of Texas first affirmed the conviction, but subsequently, on rehearing, modified its opinion and reversed. The juror was permitted to answer questions concerning what he believed the weight of the testimony necessary to establish the defense of insanity should be, and while he conceded he would follow the instructions of the court, it was his opinion that the evidence should be overwhelming. The court therein made the following observation:

"... So we confidently submit that there is no similarity of meaning between the terms, 'overwhelming proof,' and 'preponderance of the testimony.' And where the law requires the latter quantum, and a

juror upon his voir dire testifies that he will require the former, he disqualifies himself to hear the defense of a defendant charged with murder, whose sole reliance is that he committed the homicide without legal justification or provocation, and was insane at the time, and offers to prove the same by a preponderance of the testimony, which, while it may leave the mind in doubt as to the very truth, shall preponderate in favor of that side whereon the doubts have less weight—that is, where weighed by a mind open to such conviction upon such testimony, but who admits his inability to prove his defense by overwhelming proof—a species of proof hardly within the reach of a young and obscure Negro, who, while always afflicted, had never been adjudged insane by a court, and had, happily, never before committed an act of such violence."

Cutting between those two lines of authorities are others which permit jurors to be interrogated on the amount of evidence which would lead them to convict when unusual events or novel questions may present mental obstacles. Dennis v. United States, 339 US 162, 94 L ed 734, 70 S Ct 519 (1950), is illustrative of a case in which the Supreme Court, in effect, voiced approval of a procedure which permitted counsel for the accused to inquire of prospective jurors whether their mental freedom to find a defendant not guilty would be impaired by the fact that the prospective jurors were Government employees, the so-called "loyalty order" (Executive Order 9835, March 21, 1947) was then outstanding, and the accused was a well-known Communist. It was felt by defense counsel in that instance that jurors would convict regardless of the weight of the evidence, notwithstanding instructions to the contrary, and he was permitted to inquire in that area.

In State v. Plumlee, 177 La 687, 149 So 425, 431 (1933), the Supreme Court of Louisiana stated:

"Where unusual and novel points of law are involved, the state has the right to know what attitude the prospective juror will take toward it and whether he will follow the court's charge concerning it. While it is the duty of jurors to follow the law as given them in charge by the court, yet experience teaches that men frequently entertain prejudice not only against particular laws but against particular defenses as well, and if such prejudice is strong enough, it will necessarily disqualify them from jury service in such cases.

"This identical question was before the Supreme Court of the state of Washington in 1907, in the case of State v. Julius Marfaudille, supra. That was a trap gun case and the court held that the trial court did not err in permitting the state to propound such questions."

In United States v. Deain, 5 USCMA 44, 17 CMR 44, and United States v. Carver, 6 USCMA 258, 19 CMR 384, we, in effect, authorized the asking of questions in a somewhat similar area, but one more peculiarly pertinent to military justice, and the examination produced testimony that a member believed that every person in the military, who was charged with an offense, was presumptively guilty. There a member's state of mind about the guilt of an accused before trial was developed, and the examination disclosed the impossibility of the accused receiving an impartial trial.

Out of the welter of cases dealing with this subject—some of which we have mentioned—comes the general principle that each case must be separately analyzed to determine whether, under the issues, facts, and circumstances involved, the specific rulings were an abuse of discretion. Here, there is no showing, unless it be found in the length of the sentence imposed, that the members were biased or prejudiced against the accused or the particular offenses. The members were later examined on their views concerning the matters they would consider pertinent in determining a sentence, and all expressed a belief that the mere fact that the accused was colored and the female victims were not, would not aggravate the sentence. These particular questions were directed toward the findings and so any abuse of discretion must be measured for its effect in that field. In the light of that, and the holdings of the Federal cases, we are not prepared to say that the law officer abused his discretion. Particularly is that true here, because the court members were adequately instructed on the weight of the evidence necessary for conviction, presumption of innocence and the benefit of reasonable doubt. In addition, the law officer specifically and particularly admonished the members that they must follow the law as given to them by him, and in so many words he told them that to do otherwise "would be a violation of your sworn duty." We certainly can find nothing in this record which remotely suggests they did not follow this instruction, or fail to accord to the accused the benefits of all the rights and privileges accorded to him by the law.

By so holding, we do not seek to encourage law officers to be miserly with counsel on the preliminary examination. Within the military system, if any reason is advanced therefor, we think the law officer who either inquires himself or permits inquiry to determine with certainty that court-martial members will accept their law from the law officer, follows a desirable course. Especially should this be the case where a member is of higher rank than the law officer, and where he expresses some mental reservations about the type of offense or the guilt of the accused. However, our present problem is in a discretionary field, and for the reasons announced previously, we do not find any abuse.

V

The next questions which the law

282

officer held improper were asked after a member stated he would determine an appropriate sentence from all the facts in the record. These are the questions and rulings:

"DEFENSE COUNSEL: . . . Have you ever served upon a court in which there was a policy to give the maximum sentence and leave matters of clemency up to the convening authority?

"LAW OFFICER: I see no reason for carrying on this particular line of questioning, the Colonel has answered the question in regard to this particular case.

· · · · · · ·

"DEFENSE COUNSEL: Again I direct my question to the President of the court. Sir, I ask you if you would require evidence of aggravation and evidence of previous convictions before arriving at a maximum sentence?

"LAW OFFICER: I think that you are just asking the same question that you have all ready asked the Colonel who admitted to you that he would arrive at a sentence to be determined by the evidence that is admitted. That could include evidence of mitigation. I think you are off on the wrong track on this particular line of questioning."

These questions dealt solely with the sentence and we see no reason why a court member should be required to state specifically what he would consider in arriving at an appropriate sentence before he knew the facts to be developed. United States v. Carver, supra. That is asking a member to answer a hypothetical question with many essentials missing. A maximum sentence is a legal sentence and whether it is appropriate cannot be ascertained by isolating individual ingredients. And what content a court member would put into the phrase "evidence of aggravation" is conjectural. Apparently counsel thought it might mean the age of the female set by the Code. The court-martial member had already expressed the view that he believed it was the duty of the court to determine the sentence to be given, if any, upon the whole of the evidence presented to the court-martial, and we believe that is as far as he is required to go. Furthermore, the member had stated that his own action on the sentence, if it came to that, would be determined upon the basis of all of the evidence presented, and not upon what a convening authority might do. Moreover, it is irrelevant whether he had been a member of a court-martial which adopted a different policy. Even assuming such a policy had been adopted, he may not have agreed to the policy and he need not disclose the nature of what he considered during the secret deliberations on another case. After all, the only important matter before this law officer was whether the member was prepared to assess an appropriate sentence in this case.

## VI

Defense counsel next directed his questions to another court-martial member, and asked:

"DEFENSE COUNSEL: . . . Sir, if it is shown that a witness is prejudiced against the accused, would you be less inclined to believe that witness than if he had no such prejudice?

"LAW OFFICER: Just a minute Captain, that question again is improper because it touches on whether or not a witness has been impeached. That is a question that each individual court member can determine only after hearing the testimony of the particular witness as to whether or not he has been impeached. It's impossible to answer a question of that type prior to hearing that witness testify and hearing the evidence of the case.

· · · · · · ·

283

"DEFENSE COUNSEL: . . . If it is shown that a witness is prejudiced against negros [sic] and that the accused is a negro, would you be just as inclined to believe the witness as though he had no such prejudice?

"LAW OFFICER: That question is along the same line. You are assuming the fact that; to have the witness impeached."

These two questions are argumentative and, in effect, asked the court-martial member to assess a witness' credibility before he had testified. In addition, there were far too many factors missing from the question to permit it to be answered intelligently. Credibility is not determined by speculating on some type of imaginary class prejudice and if the member answered in a rational manner, he would be required to state that he could not answer until he had some basis for determining the reliability of the witness. We can assume that the female victims of the crimes would be prejudiced against the accused, but that would not necessarily affect their credibility. In United States v. Carver, supra, we expressed the view that neither party may inquire concerning a court-martial member's view of evidence to be presented at trial or the weight which the member would be inclined to attach to it or to any witness who might thereafter appear.

Of course, it is perfectly proper for counsel to inquire whether a court-martial member is personally prejudiced against Negroes, where the defendant is a Negro. Aldridge v. United States, 283 US 308, 75 L ed 1054, 51 S Ct 470 (1931). But this law officer expressly offered defense counsel an opportunity to explore in those areas, and while defending counsel did not take full advantage of the offer, that is a matter about which he cannot complain.

284

VII

The last question which merits our consideration is as follows:

"DEFENSE COUNSEL: And again I ask you if the accused was found guilty of taking indecent liberties with a child under the age of sixteen, would you consider the fact that the child is under the age of sixteen an aggravated circumstance?

"LAW OFFICER: Now, just a minute, that question I believe is a little bit improper because . . . for this reason. The offense is: Taking indecent liberties With [sic] a child under the age of sixteen years, and whether or not it is aggravated or not, I don't think that the fact that the child is under sixteen years may be considered as aggravating the offense."

The question asked by defense counsel in effect required the court-martial member to state whether he would consider an element of the offense an aggravating circumstance. Congress apparently considered the age of the victim of some significance and so would any right-minded citizen. We only need point out that, generally speaking, the younger the female, the more abhorrent the crime becomes. Here again, defense counsel sought to probe a court member's mind for imponderables that are unknown until all the evidence is in. Every court-martial member probably opposes this form of crime in general, but it constitutes no disqualification that he is opposed to some crimes more than others. The degree of such a distaste is not, in itself, a test of the member's qualifications, and he is not disqualified because he abhors the particular crime charged more than others. State v. Marcus, 240 Iowa 116, 34 NW2d 179 (1948); Shank v. State, 189 Ark 243, 72 SW2d 519 (1934); Dies v. State, 56 Tex Crim 32, 117 SW 979 (1909). The real test is whether he is mentally free

to render an impartial finding and sentence based on the law and the evidence. It follows that no ground of disqualification could have been elicited by this question.

## VIII

While we affirm the decision of the board of review, we call attention to the severity of the sentence affirmed in this case. It is in every respect legal, and the board of review has specifically found it to be appropriate. We are, by law, powerless to reduce the term of confinement, but a term of thirty years seems excessive to us in the light of the record and the absence of other convictions. We mention our views for the benefit of those authorities who may subsequently review the record for clemency purposes.

The decision of the board of review is affirmed.

QUINN, Chief Judge (concurring):

I concur generally with the principal opinion. However, I disagree with part of the discussion in Part V and with the comment on the sentence.

An accused is entitled to have his sentence as well as his guilt adjudged by court members who are ▌ uninfluenced by predetermined and fixed ideas. United States v. Dean, 5 USCMA 44, 17 CMR 44. Consequently, the defense counsel should have been allowed to inquire whether the court members had served on a court which followed a deliberate policy of imposing maximum sentences. The mere statement by the court member that he would impose a sentence on the basis of the evidence presented in the case should not have precluded further questioning as to his possible bias. However, the accused waived his right to attack the law officer's ruling. He made no objection to the ruling; he asked no further questions about the member's prior court service; and he did not challenge the member. United States v. Thomas, 3 USCMA 161, 11 CMR 161.

Insofar as the sentence is concerned, I do not agree that it is excessive. Moreover, the decision implies that this Court lacks power to review a grossly excessive sentence. The Court has never directly considered the extent of its power, if any, to review such a sentence. See: United States v. Keith, 1 USCMA 442, 451, 4 CMR 34; United States v. Engle, 3 USCMA 41, 11 CMR 41, concurring opinion of Judge Brosman; United States v. Voorhees, 4 USCMA 509, 16 CMR 83, concurring opinion of Judge Latimer. The question, therefore, is still an open one.

BROSMAN, Judge (concurring in the result):

I find myself in agreement with the Court's disposition of the law officer's *voir dire* rulings. While in one, possibly two, instances the conclusion reached may be open to argument, all are defensible rationally, and soundly based in authority—and I can have no quarrel with any of them.

With respect to the second question posed—that having to do with whether members of the court-martial would feel privileged to disregard the law officer's instructions, the opinion makes reference to Federal authorities only, and, of those cited, only the Bonness case seems sharply in point. Many state decisions as well, I believe, support the prohibition of such a question. See, e.g., People v. Tibbets, 102 Cal App 787, 283 Pac 830; State v. Hoagland, 39 Idaho 405, 228 Pac 314.

Particularly do I concur in Judge Latimer's exhortation of liberality in law officer rulings on proposed *voir dire* questions. However, I would prefer not to accept without further consideration his proposal that military courts follow the tack of Federal Rule 24(a), which allows the examination of jurors through the trial judge. The current Manual provides in paragraph 62b that *"the trial or defense counsel* may question the court, or individual members thereof."* This may be hard to square

with the Federal rule, which would permit the law officer wholly to remove the matter of *voir dire* examination from the hands of the lawyers for the Government and the defense.

Of course, I must dissociate myself from the use made in the principal opinion of United States v. Carver, 6 USCMA 258, 19 CMR 384. I do this for the reason that, to my mind, the present reference, as well as the case itself, completely misapprehends the troublesome issue involved in Carver—as I sought to demonstrate in the initial portion of my dissent in that case.

With respect to sentence, I find myself more nearly in agreement with Judge Latimer than with the Chief Judge. Without receding in any degree from the views I have expressed in earlier opinions, I may say that nothing in this case prompts me to believe that the board of review departed from its statutory authority and duty in affirming the sentence it did. Certainly I would not have made the determination they did—but this has nothing to do with the problem before us. It follows that I agree fully with Judge Latimer that the accused should be considered a strong candidate for clemency.