UNITED STATES

v.

Dana Lee PACK, 564 98 5315, Seaman (E–3), U. S. Naval Reserve.

NCM 79 0264.

U. S. Navy Court of Military Review.

Sentence Adjudged 8 Nov. 1978.

Decided 16 June 1980.

LCDR Lawrence W. Muschamp, JAGC, USN, Appellate Defense Counsel.

MAJ D. A. Higley, USMC, Appellate Government Counsel.

Before CEDARBURG, FERRELL and DONOVAN, JJ.

DONOVAN, Judge:

Pursuant to his guilty pleas, appellant was convicted of triple sex offenses: rape and sodomy on 24 June 1978, rape and sodomy on 24 July 1978, and an attempted rape and theft of female undergarments on 30 July 1978. Articles 80, 120, 121 and 125, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 880, 920, 921, 925. Each of the offenses involved a different female member of the United States Navy as the victim; each victim had been asleep in government quarters just prior to the commission of the offenses. Sentenced by members to a bad-conduct discharge, reduction to pay grade E-1, forfeitures of $400.00 per month for 15 years and confinement at hard labor for 15 years, appellant's pretrial agreement was honored by the convening authority who approved the sentence adjudged except for remitting forfeitures and confinement in excess of 10 years.

Appellant assigns two errors. We reject them and affirm.

# I

THE EXERCISE OF COMMAND IN-
FLUENCE BY THE OFFICER IN
CHARGE OF BOTH DEFENSE COUN-
SEL DENIED APPELLANT A MINI-
MALLY FAIR TRIAL.

# II

THE MILITARY JUDGE ERRED IN
FAILING TO STRIKE AN ARRAY
CONSTITUTED ENTIRELY OF THE
SOCIAL AND PROFESSIONAL ASSO-
CIATES OF THE VICTIMS OF THE
VARIOUS CHARGED OFFENSES.

# I

Lieutenant M was requested as individual military counsel on 19 October 1978, the very morning of the first Article 39(a), UCMJ, 10 U.S.C. § 839(a), session of this trial. After two continuances, trial proceeded on 7 November at which time Lieutenant M moved to dismiss all charges and specifications on the grounds of unlawful command influence. The alleged influence was neither the assertion of seniors pressuring juniors to charge, convict nor punish a subordinate, but was instead the individual military counsel's (IMC) perception that certain derogatory remarks made by the Officer-in-Charge (OIC) of the local Naval Legal Services Office (NLSO) about the IMC's prior performance as a defense counsel would chill his efforts in this case to the detriment of appellant. (R.20). Complicating the facts in this situation is the unusual circumstance that the OIC of the NLSO was temporarily serving as the staff judge advocate (SJA) of this convening authority at the time of the motion to dismiss, although he had not yet so served when the convening authority referred these charges to a general court-martial. The fitness report which Lieutenant M found objectionable was based on recommendations of his superior(s) and was written, according to the OIC's affidavit which has been submitted to us by appellate government counsel, long before Lieutenant M received it on 17 October 1978, its delay being occasioned by counsel's absence in the continental

United States from the overseas trial site. We note, however, that block 83, the space in which to place the "Date Forwarded", is blank on Appellate Exhibit VI, a copy of the fitness report.

Appellant, having heard Lieutenant M's expressions of apprehension based on his superior's reported dissatisfaction with overzealous defense actions in past cases, adhered to his choice of Lieutenant M as IMC. (R.24).

■ The military judge denied the motion to dismiss as well as the Government's request for a recess with a view to decertifying Lieutenant M upon the trial counsel's assertion that Lieutenant M's protestation of command pressure was tantamount to a confession of incompetence. We view the judge's actions in both matters as correct and adopt his reasoning:

It would appear further to the court that the individual military counsel in this case can in no way act to his detriment by full and vigorous representation of his client in this case, except as he perceives possible adverse effects through comments in future fitness reports by the Officer in Charge, Naval Legal Services Office, Yokosuka, Japan. To the extent that any such comments in the fitness reports before this court—in the fitness report before this court or future fitness reports are contrary to the provisions of Article 37, UCMJ, [10 U.S.C. § 837] Paragraph 38, *Manual for Courts-Martial,* or BUPERS Instruction 1611.12E, and to the extent that they would adversely affect the individual military counsel, he can avail himself of remedies afforded in the UCMJ or through administrative measures.

(R.25). Lieutenant M immediately thereafter stated that he would withdraw from the case, having consulted with appellant, who reluctantly agreed. No other IMC was sought. The pretrial agreement had been signed by appellant on 3 November 1978, four days before this withdrawal. The case thereafter went to trial with appellant represented by the detailed defense counsel.

Disciplinary Rule 5–101 of the American Bar Association's (ABA) Code of Professional Responsibility, as amended August 1978 and as then in force, recites in pertinent part:

Refusing Employment When the Interests of the Lawyer May Impair His Independent Professional Judgment.

(A) Except with the consent of his client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property, or personal interests.

The military judge cited this Disciplinary Rule (DR) to Lieutenant M, reasoning that Lieutenant M's fear of another adverse report on his future could be such a personal interest as would prompt withdrawal. Lieutenant M noted the basis for such observation but rejected its applicability as an inversion of justice; in his view, the Government should not be permitted to err by submitting a report impermissible under Article 37, UCMJ, and then seek to avoid the proper penalty for such reporting by forcing out of the trial the officer on whom the report was submitted.

■ The ABA Code of Professional Responsibility is applicable to Navy and Marine Corps judge advocates, *see* JAGMAN § 0142 and Appendix A–1–p(1), as are the ABA's Standards on the Prosecution Function and the Defense Function. *Id.* The following excerpts from those sources are pertinent. DR 2–110 addresses Withdrawal from Employment and, *inter alia*, provides:

(A) In general.

(1) If permission for withdrawal from employment is required by the rules of a tribunal, a lawyer shall not withdraw from employment in a proceeding before that tribunal without its permission.

(2) In any event, a lawyer shall not withdraw from employment until he has taken reasonable steps to avoid foreseeable prejudice to the rights of his client, including giving due notice to his client, allowing time for employment of other counsel, delivering to the client all papers and property to which the client is entitled, and complying with applicable laws and rules.

. . . . .

(B) Mandatory withdrawal.

A lawyer representing a client before a tribunal, with its permission if required by its rules, shall withdraw from employment, and a lawyer representing a client in other matters shall withdraw from employment, if:

. . . . .

(3) His mental or physical condition renders it unreasonably difficult for him to carry out the employment effectively.

(4) He is discharged by his client.

(C) Permissive withdrawal.

If DR 2–110(B) is not applicable, a lawyer may not request permission to withdraw in matters pending before a tribunal, and may not withdraw in other matters, unless such request or such withdrawal is because:

. . . . .

(2) His continued employment is likely to result in a violation of a Disciplinary Rule.

. . . . .

(4) His mental or physical condition renders it difficult for him to carry out the employment effectively.

(5) His client knowingly and freely assents to termination of his employment.

(6) He believes in good faith, in a proceeding pending before a tribunal, that the tribunal will find the existence of other good cause for withdrawal.

ABA Standards on the Defense Function 1.1 states in part:

1.1 Role of defense counsel; function of standards.

(a) Counsel for the accused is an essential component of the administration of criminal justice. A court properly constituted to hear a criminal case must be viewed as a tripartite entity consisting of the judge (and jury, where appropriate), counsel for the prosecution, and counsel for the accused.

(b) The basic duty the lawyer for the accused owes to the administration of justice is to serve as the accused's counselor and advocate, with courage, devotion and to the utmost of his learning and ability, and according to law.

.   .   .   .   .

(e) It is the duty of every lawyer to know the standards of professional conduct as defined in codes and canons of the legal profession and in this report, to the end that his performance will at all times be guided by appropriate standards. .   .

Both Lieutenant M's and the OIC's affidavits[1] relate that Lieutenant M had a humanitarian transfer from Japan to the continental United States pending before the time appellant had requested Lieutenant M as IMC; further, Lieutenant M acknowledges his then-abiding motivation not to be delayed in his departure. In resolving this appeal, we consider that the issue asserted in the first assignment of error would exist even if the OIC had not assumed the role of SJA. In regard to the judgment rating indicated in block 67 of Appellate Exhibit VI, the fitness report, it is clear that the fitness report addressed his substantial duties representing service members at administrative discharge boards and was not concerned only with his defense efforts in trials by court-martial. Command reactions to the efforts of counsel at such boards, albeit such boards are protected by administrative due process

standards, are not constrained as they are by Article 37, UCMJ, regarding courts-martial. We read the objected excerpts of the fitness report as addressing uncontrolled energy, zeal over and above that flowing from mature counsel judgments, and energy which did not "organize and purposefully present a case .   .   . clearly articulate his position .   .   .," Appellate Exhibit VI, the end result of which was a diminished credibility with commands to which his clients were assigned. We perceive no issue of OIC retaliation for Lieutenant M's resort to the American Red Cross and Congressional aid in gaining his humanitarian transfer; nor has any restriction of the permissible First Amendment exercise been cited to us.[2]

DR 2–110(C)(4) appears to provide an ethical basis for Lieutenant M's withdrawal: his mental condition rendered it difficult for him to carry out his duties effectively. We balance his fear of reprisal against the very first standard enunciated by the ABA's Standards Relating To The Defense Function:

> The basic duty the lawyer for the accused owes to the administration of justice *is to serve* as the accused's counselor and advocate, *with courage*, devotion and to the utmost of his learning and ability. .   .

(Emphasis supplied). We think the balance was struck by Lieutenant M on the side of timidity. If, as appellant urges, the remedy for arguably improper words in a defense counsel's fitness report is dismissal of rape and sodomy charges on this appellant, by what standard and when can we conclude that the wrong will be righted? Will one dismissal satiate the complaint or are several of Lieutenant M's clients to enjoy this remedy? The record, as amended, still does

1. These affidavits are properly accepted and made a part of the record. *United States v. Harrison*, 3 M.J. 1020, 1022 (N.C.M.R.1977); *United States v. Roberts*, 7 U.S.C.M.A. 322, 22 C.M.R. 112 (1956).

2. *See U. S. Navy Regulations (1973)*, Article 1148, which quotes 10 U.S.C. § 1034:

.   .   .   .   .

Communicating with a member of Congress. No person may restrict any member of an armed force in communicating with a member of Congress, unless the communication is unlawful or violates a regulation necessary to the security of the United States. Aug. 10, 1956, C. 1041, 70 A. Stat. 80.

not reflect his rebuttal to the fitness report nor his exercise of any administrative remedies the judge noted as available. Surely civilian trial judges can admonish trial defense counsels, after trial, on procedural matters without disabling future litigation because of a perceived chill. Is not the affected reputation of a chastised civilian counsel as much or more damaged in his permanent community as that of a frequently reassigned military lawyer? [3]

█ The intent of Congress in revising Article 37, UCMJ, upon which appellant relies, was to protect military lawyers from commanders' retribution. It was not intended to hobble the supervisory mechanisms of the services' Judge Advocates General in marking and promoting service lawyers. SENATE ARMED SERVICES COMMITTEE, INCREASING THE PARTICIPATION OF LAW OFFICERS AND COUNSEL ON COURTS–MARTIAL, S.REP.NO.1601, 90th Cong., 2d Sess. 2, (1968) (relative to H.R.15971). Regarding the independence of defense counsel within the soon-to-be-established Judge Advocate General's Corps of the Navy, the following extract from the hearing relative to the establishment of a Navy Judge Advocate General's Corps is informative:

Mr. PHILBIN. They always have the right to get civilian counsel if they are not satisfied with any counsel provided for him by the Navy or the service.

Admiral HEARN. That is correct, sir.

Mr. PHILBIN. If there is a doubt in the minds of his friends or relatives interested in him, any question of whether he is getting proper representation, they are usually in a position where they can remedy that by getting a civilian lawyer if they want one. That happens quite frequently, doesn't it?

Admiral HEARN. They do, as a matter of choice, but I can assure you every counsel assigned to the accused is an adequate counsel.

Mr. PHILBIN. They are qualified counsel?

Admiral HEARN. Yes, sir.

Mr. PHILBIN. They are well trained counsel?

Admiral HEARN. Yes, sir.

Mr. PHILBIN. They are experienced counsel, also, they know the code, and they know the rights of the individual under the Constitution and under the law, they are well trained to represent an accused with respect to those rights?

Admiral HEARN. Yes, sir.

Mr. PHILBIN. Have you had any complaints along that line from people, any valid complaints, that accused weren't being properly represented?

Admiral HEARN. None that I can recall, sir. And I might just say, because of the volume of court-martial work that we handle in some areas, our young officers get experience in the trial of cases in comparison with their civilian contemporaries as, I would say, an average of 5 years to 1.

Mr. PHILBIN. I think that was a very good point that you brought up, Mr. Machen. I think it is something that ought to be clarified for our record. Are you satisfied with the answers that you got, so far as the Navy is concerned? They are doing the best they can to provide good service for their men.

Mr. MACHEN. I would like to pursue it just one step further. For example, only half of your current legal officers are lieutenant and lieutenant junior grade. A great bulk of them are just out of law school, with no trial experience, with no background experience at all.

Are they the ones that are normally assigned to be defense counsel? How about your senior officers? My experience in cases I have, it is always a lieutenant, or lieutenant junior grade who is defense counsel. He is a boy that is just out of law school.

Admiral HEARN. That is because of our overall lack of experienced officers

---

3. We need not address the numerous cases of ridicule, abuse and loss of further clients suffered by courageous American lawyers who, throughout our history, have defended unpopular clients.

sir, and one of the things I hope this bill will correct.

Mr. MACHEN. I'm not criticizing you, Admiral, on that, but I'm criticizing the inexperience of a law school graduate, as he can't compete with a man handling the prosecution of the case that has been in the service 5 or 10 years, and has experience before your board. I don't care whether it is a court or a court-martial or anything else; that comes from experience. You do not learn it in the law books.

Mr. EVANS. Will the gentleman yield on that point?

Mr. MACHEN. Yes.

Mr. PHILBIN. Mr. Evans.

Mr. EVANS. Is this the custom in the Navy—that is, that among your junior officers, your lieutenants, and your lieutenants junior grade, is the matter of practice in the Navy that the job of defense counsel is usually assigned to them, whereas the job of prosecutor is assigned to the lieutenant commander?

Admiral HEARN. No, sir, that is not the case.

Mr. EVANS. Would it be correct to say that both the prosecution and defense responsibilities are assigned to both of these senior or junior grade officers, evenly?

Admiral HEARN. I think you would find, if you would take an analysis of all the cases, that there is more experience on the defense side than there is on the Government side.

Mr. EVANS. Thank you.

Mr. PHILBIN. You have schools for training these men?

Admiral HEARN. And we send them to the Naval Justice School in Newport for a period of 7 weeks, after they have their indoctrination and before they are assigned to duty.

Mr. BENNETT. Mr. Chairman, I would like to pursue a few questions along this line.

Mr. PHILBIN. Mr. Bennett.

Mr. BENNETT. Having been a lawyer before the time I was serving in World War II, I realize there are some grounds for feeling that some people could get a bias, one way or the other, and I would like to observe about this, the passage of this legislation would not make it more difficult to eliminate that bias in the assignment of a particular person to a particular duty, would it?

Admiral HEARN. It would have no connection whatsoever.

Mr. BENNETT. And other branches of the service have Judge Advocate General Corps, do they not?

Admiral HEARN. Yes, sir.

Mr. BENNETT. None of these other branches, by statute, set out anything about isolating or eliminating any particular persons with regard to whether they prosecute or defend, do they?

Admiral HEARN. I think it is the practice in the other services, as it is in our service, to broaden the experience as much as possible, to give the lawyer a chance to perform all types of the legal duty which we are required to perform.

Mr. BENNETT. So, although, there is a possibility of dangers occurring, such as have been mentioned, the other branches of the service do have what you are seeking in this legislation, and as far as you know, they have met this challenge, and there has been no criticism?

Admiral HEARN. No criticism that I am aware of.

Mr. BENNETT. And you would be able to assure us that as far as you know the Navy would do everything in its power to see that no bias or anything of that type would creep in, or any lack of proper assignment would creep in that would be detrimental to any person accused?

Admiral HEARN. Absolutely not. I can assure you, Mr. Congressman, and Mr. Chairman, that we follow such a practice today, of insuring that every side is properly represented, and that no bias is developed in any of our cases.

Mr. PHILBIN. I think we have another witness here, after the admiral finishes the testimony, that will probably be able to amplify the statement, concerning the

**758**

training of these officer candidates, and the care the Navy takes to train specialists in this field.

*House of Representatives Subcommittee No. 1 Hearing on Title IV of H.R. 226,* 90th Cong., 1st Sess. 5228–29 (14 Sept. 1967). *See generally* 114 CONG.REC. S 12,030 (daily ed. Oct. 3, 1968).

The foregoing reflects the legislative intent that judge advocates will be even further controlled, from an administrative viewpoint, by the service Judge Advocate General. If service accessions from law school are to be properly evaluated, retained and promoted, a frank fitness report system is essential. Such reports are clearly not one of the "unauthorized means" proscribed by paragraph 38a, *Manual for Courts-Martial, 1969, (Rev.)* (MCM). Similarly, the supervisory mechanism of each Judge Advocate General is an implicit exception to the language of paragraph 38d, MCM.

■ The detailed counsel's conduct of the trial appears competent. We reject appellant's argument that the lack of cross-examination of the complainants reflects a defeatist posture. It was sound tactics since each of the victims could have revealed far more damaging details on cross-examination than were elicited on direct examination.

## II

■ The reasoning of appellate government counsel addresses the second assigned error and disposes of it well. There were no factual predicates uncovered or reasonably latent as would indicate that the members were disqualified by bias. Paragraph 62f, MCM; *United States v. Cleveland,* 15 U.S.C.M.A. 213, 35 C.M.R. 185 (1965); *United States v. Parker,* 6 U.S.C.M.A. 274, 19 C.M.R. 400 (1955).

In sum, appellant explained his crimes as alcohol induced. The members noted, however, that these were three events, not the single product of one spasm. The findings

and sentence as approved on review below are affirmed.

Chief Judge CEDARBURG and Judge FERRELL concur.