UNITED STATES

v.

**Airman First Class Jeffrey W. McDAVID, FR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 United States Air Force.**

ACM 29287.

U.S. Air Force Court of Military Review.

Sentence Adjudged 23 Feb. 1991.

Decided 23 June 1993.

Appellate Counsel for the Appellant: Colonel Jeffrey R. Owens and Captain Michael D. Burt.

Appellate Counsel for the United States: Colonel William T. Hoffman, Lieutenant Colonel Brenda J. Hollis, Major Paul H. Blackwell, Jr., and Captain James C. Sinwell.

Before DIXON, GRUNICK, and HEIMBURG, Appellate Military Judges.

### OPINION OF THE COURT

HEIMBURG, Judge:

Convicted of violating an Air Force regulation by possessing drug abuse paraphernalia and possessing lysergic acid diethylamide (LSD)[1], appellant has assigned six errors in the trial of his case. Although we find none persuasive, several merit discussion.

### I

■ Appellant asserts, as he did at trial, the specification of Charge I fails to state an offense because the "drug paraphernalia" identified therein are *not* drug paraphernalia within the meaning of the Air Force regulation cited in the specification. Our review on this issue is limited to the language of the specification, which must, either expressly or by necessary implication, allege every element of the charged offense. R.C.M. 307(c)(3); *Cf. United States v. Schwarz*, 15 M.J. 109, 111 (C.M.A. 1983). The specification reads as follows

In that AIRMAN FIRST CLASS JEFFREY W. MCDAVID ... did, at or near Francis E. Warren Air Force Base, Wyoming, on or about 27 July 1990, violate a lawful general regulation to wit: paragraph 3–2(c) of Air Force Regulation 30–2, dated 19 August 1988 as amended by Interim Message Change 89–1, dated 15 February 1989, by wrongfully possessing drug paraphernalia, to wit: instructions for producing Lysergic Acid and Lysergic Acid Amide (Schedule III, 21 USC 812, controlled substances); a one liter container of petroleum distillate labelled reagent quality Petroleum Ether, and a

---

1. In violation of Articles 92 and 112a, UCMJ. The general court-martial members sentenced appellant to a bad-conduct discharge, confinement for 6 months, forfeiture of $300 pay per month for 6 months, and reduction to E–1. The convening authority approved the sentence as adjudged.

500 milliliter bottle of reagent quality Methanol.

Air Force Regulation (AFR) 30-2 defines "drug abuse paraphernalia" as "[a]ny equipment, product, or material that is used, intended to be used, or designed to be used, in ... manufacturing, compounding, converting, producing, processing, preparing ... a controlled substance." AFR 30-2, Social Actions Program, paragraph 3-3c, 19 August 1988.

Appellant's attack on the legal sufficiency of this specification has two aspects. First, he argues the written "instructions" are not drug paraphernalia. In support of this contention, he points to the definition of "drug abuse paraphernalia" [2] quoted above and argues written instructions do not fit this definition—they are not "equipment, product, or material."

█ This is apparently a case of first impression. Although "drug paraphernalia" has been the subject of prosecution for decades in military practice,[3] we have found no military cases in which a writing was charged as "paraphernalia." Resort to federal decisions has uncovered no case directly on point, although a drug recipe was considered by the Sixth Circuit to be part of the "paraphernalia" supporting the existence of a conspiracy to manufacture a controlled substance. *United States v. Green*, 548 F.2d 1261 (6th Cir.1982). Among the states with paraphernalia statutes, only North Dakota appears to have addressed this issue, upholding a conviction for possession of a "recipe" as drug paraphernalia. *North Dakota v. Raywalt*, 436 N.W.2d 234 (N.D.1989).

Despite the paucity of precedents, we have no trouble upholding this specification. It is not straining the plain meaning of the term to call a writing a "product." An ordinary dictionary definition of the term "writing" includes the notion that a writing is a "work" or "composition," a *product* of the intellectual effort of the author. *See* Webster's Ninth New Collegi-

ate Dictionary (1990), Webster's II New Riverside University Dictionary (1984). On the other hand, one may equally freely call a writing "material," for that term is used often to speak of writings. *See* Webster's Ninth New Collegiate Dictionary (1990).

The writing here charged as drug paraphernalia is identified as "instructions for *producing Lysergic Acid and Lysergic Acid Amide* (Schedule III, 21 U.S.C. 812, controlled substances)." The purpose of the writing is crucial to its identification as paraphernalia. By indicating the writing is a "recipe" for producing a controlled substance outlawed in the United States Code, the specification clearly meets the definition of AFR 30-2, paragraph 3-3c, for a recipe is "[a]ny ... product, or material that is used, intended to be used, or designed to be used, in ... manufacturing, compounding, converting, producing, processing, [or] preparing ... a controlled substance." Paragraph 3-3c, AFR 30-2.

█ Appellant argues, nevertheless, that "punishing someone for possessing a document that they wrote themselves has profound constitutional implications." There was expert testimony that the recipe was in appellant's handwriting, but his claim of constitutional protection falls short. This prosecution was not for *writing* a drug recipe, but for possessing it *with* a criminal intent. We are not dealing with the case of one who was prosecuted for the dissemination of ideas or the expression of views. The trial judge correctly instructed the members they could convict appellant "only if the accused ... possessed [the items charged as paraphernalia] with the intent to use them to manufacture, compound, convert, produce, or process lysergic acid or lysergic acid amide." This requirement—that possession of the writing be with a criminal intent to produce a controlled substance—saves the specification from running afoul of the First Amendment. We have no First Amendment concerns about a specification which alleges as

---

**2.** No issue has been raised about the distinction, if any, between "drug abuse paraphernalia" and "drug paraphernalia." For purposes of this appeal, we construe the terms as identical.

**3.** *See, e.g. United States v. Gohagen,* 2 U.S.C.M.A. 175, 7 C.M.R. 51 (1953).

criminal the act of possessing a recipe for concocting an illegal controlled substance, together with some of the chemical components of the controlled substance.

■■■ The second prong of appellant's argument for the failure of this specification is that the two chemicals listed in the specification, ether and methanol, are "perfectly legal" to purchase and possess, and have "countless lawful uses." The possession of otherwise innocent items can be made criminal, however, if accompanied by scienter or *mens rea. United States v. Cannon*, 13 M.J. 777, 778 (A.C.M.R.1982); *United States v. Dykes*, 6 M.J. 744, 747 (N.M.C.M.R.1978); *United States v. Sweney*, 48 C.M.R. 476 (A.C.M.R.1974). This specification, judged on its face, is not defective because items charged as drug paraphernalia may be lawfully possessed.

We conclude this specification, alleging possession of "written instructions" and two chemicals, "petroleum ether" and "methanol," states the offense of "possession of drug paraphernalia," in violation of AFR 30–2 and Article 92, Uniform Code of Military Justice.

## II

Appellant claims prejudicial error in the failure of the trial judge to grant a challenge for cause against one of the court members. Major A served as the commander of a squadron whose mission was to provide security to missiles employed by the parent wing. Despite the fact that his duties did not then involve criminal law enforcement, Major A's education and experience in that field was extensive, including bachelor's and master's degrees, civilian police experience, and more than 11 years of law enforcement duties in the Air Force. Both the military judge and counsel questioned Major A at length about his background, education, experiences, and views on law and law enforcement. Trial defense counsel then challenged Major A for cause, asserting he was "too inextricably intertwined with the law enforcement function" and, thus, there was "substantial doubt" as to his fairness and impartiality. The defense counsel also cited Major A's

answer to the following questions as indicative of his lack of impartiality.

DC: When you were a police officer, either civilian or military, did you ever make any drug arrests?

MEM: Yes, I did.

DC: Of the arrests that you made, how many of those do you believe were factually not guilty?

MEM: Factually not guilty?

DC: Yes.

MEM: If I made the arrest, then I had some, some presumption of guilt, I would say. To the best of my ability, if I made the arrest, I would think that it was a person that had committed the crime.

In response to the defense counsel's assertion that these comments showed a lack of impartiality, the trial judge asked, "would you want a police officer to arrest somebody that they didn't think was guilty?" Implicit in the judge's question was his assessment, which we share, of Major A's response as stating only that he would not "arrest" someone without probable cause to believe that person committed a crime. *Cf.* Article 7(b), UCMJ.

The questions quoted above were not, of course, the only ones Major A answered. In other responses, Major A said he had seen a number of cases "where things seemed very obvious, and then in a court were proven differently," so he was going to "keep an open mind" in this case. He "would not necessarily say that there was guilt or innocence associated with ... [an] arrest. It would be based on the facts of the case." As for sentencing, "that would be based on the case, the particular case at hand. I have no prejudged opinions as to what the penalties may be." Satisfied with these and other responses, the military judge denied the challenge for cause against Major A. He noted

I certainly recognize that we have to be very careful in dealing with someone who is a panel member who has law enforcement experience, especially the amount of law enforcement experience that this member has had. However, law enforcement experience does not necessarily make a member ineligible to sit

as a court member. And weighing the balance carefully, I am well satisfied that Major [A] can perform as an impartial member. He's intelligent. His answers impressed me as being very honest and sincere. I see no evidence of partiality on his part, and he's assured me that he will follow my instructions, and I believe that he will.

 A trial judge should be liberal in granting challenges for cause, but reversal of a trial judge's rulings is appropriate only if there was "abuse of discretion." *United States v. White*, 36 M.J. 284, 287 (C.M.A. 1993); *United States v. Smart*, 21 M.J. 15, 18–21 (C.M.A.1985); *United States v. McQueen*, 7 M.J. 281 (C.M.A.1979). The tension between those two precepts is never more apparent than in cases where security policemen have been appointed as court members. In such cases, the judge must, in addition to questions about actual bias, be concerned about "perceptions of [un]fairness" which would result from allowing the challenged member to remain on the court. *Cf. United States v. Harris*, 13 M.J. 288, 291 (C.M.A.1982). We have observed that appointment of security policemen as court members should be avoided "where at all possible," *Carfang*, 19 M.J. at 740–41, but we have never adopted a "per se" rule which disqualifies an officer from court member service simply because the officer is a security policeman or has training or experience in criminal law enforcement. *United States v. Carfang*, 19 M.J. 739 (A.F.C.M.R.1984), *pet. denied*, 21 M.J. 112 (C.M.A.1985). *Accord, United States v. McPhaul*, 22 M.J. 808 (A.C.M.R. 1986), *pet. denied*, 23 M.J. 266 (C.M.A. 1986); *United States v. Swagger*, 16 M.J. 759 (A.C.M.R.1983); *United States v. Brown*, 13 M.J. 890 (A.C.M.R.1982), *pet. denied*, 14 M.J. 283 (C.M.A.1982). The test for evaluating the propriety of the trial judge's ruling denying a challenge for cause is " 'whether he [the prospective court member] is mentally free to render an impartial finding and sentence based on the law and the evidence.' " *McQueen*, 7 M.J. at 281 (quoting *United States v. Parker*, 6 U.S.C.M.A. 274, 284–85, 19 C.M.R.

400, 410–11). We will evaluate the trial judge's ruling by this test.

 The challenged member, although a security police officer, was not assigned to the security police squadron at appellant's base and had no law enforcement duties. He did not have routine access to the police blotter or other base law enforcement information. He knew one of the Air Force Office of Special Investigations (AFOSI) agents involved with appellant's case, but only from a prior assignment in Germany, where he described his contact with that agent as "probably once a month, I guess." Although he had extensive education and training in criminal law enforcement, he assured the trial judge he would not attempt to offer other members legal advice, but would follow the judge's instructions. The trial judge was satisfied Major A was mentally free to render an impartial finding and sentence, and so are we. Moreover, we are satisfied that Major A's presence on the court did not leave a perception of unfairness, apart from actual bias. We find no abuse of discretion in the judge's ruling denying the fense challenge for cause.

### III

At trial, appellant moved to suppress statements he made to two AFOSI agents acknowledging ownership of the two chemicals charged as paraphernalia which were found in his house. He asserts the trial judge's ruling admitting these statements violated his rights against self-incrimination under the Fifth Amendment and Article 31(b), UCMJ.

In addressing this issue, we adopt the trial judge's findings of fact as our own. A brief summary is necessary. On 25 July 1990, appellant's wife called authorities and consented to the search of their house which resulted in seizure of LSD and drug paraphernalia. Appellant was hospitalized the next day, due to an intentional overdose of sleeping pills. Upon his release from the hospital on 27 July 1990, he was taken to AFOSI for questioning. The interview began at 1118 with advisement of rights. Despite his hospitalization, appellant was

alert and clear-headed. Appellant immediately told AFOSI agents he wanted to speak with a lawyer. After hearing this, one agent asked appellant to consent to a search of his car. Appellant said he wanted to speak with a lawyer about that decision, but was told he could consent or not, but had no right to consult a lawyer first. Appellant then consented to the search. Although appellant maintained the agents told him he would have to wait in their office while they contacted a lawyer and it might take a long time, the agents denied this, and we find their denial credible. Nevertheless, the judge found appellant was "in custody" for fifth amendment purposes, and we agree. Immediately after appellant consented to the search, while one agent was filling out a consent form, appellant asked if he could explain something. The agents said since he requested a lawyer, they could not speak with him. Appellant asked if he could waive his right to a lawyer and, if he decided to talk, reassert the right later. The agents said he could. Appellant then waived his right to a lawyer and talked with AFOSI agents for 24 minutes. During this conversation, appellant admitted owning the "petroleum ether" and "methanol" located in the basement of his house, but said he had owned them for years, since long before he came into the Air Force, and had never used them. When questioning turned to the suspected LSD also found in the house, appellant re-asserted his right to counsel and declined to answer further questions.

■ The judge found appellant "reinitiated" the conversation with AFOSI agents, leaving AFOSI free to "reopen the interview." We agree. Despite previous assertion of his right against self-incrimination, we find appellant initiated the AFOSI interview which led to the statements at issue. *See United States v. Watkins,* 34 M.J. 344 (C.M.A.1992). Appellant's waiver of his fifth amendment right to counsel was freely and voluntarily given. *Arizona v. Roberson,* 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988); *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); *United States v. Kendig,* 36 M.J.

291, 295 (C.M.A.1992). This assertion of error is without merit.

### IV

■ We turn next to the sufficiency of the evidence to sustain the findings of guilty. Appellant urges us to find the evidence legally and factually insufficient. The test for both was set forth in *United States v. Turner,* 25 M.J. 324, 325 (C.M.A. 1987)

The test for the former is whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). For factual sufficiency, the test is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, the members of the Court of Military Review are themselves convinced of the accused's guilt beyond a reasonable doubt.

Appellant argues the evidence suggests a "setup" by appellant's wife, Marion. Marion testified she and appellant were separating with a view to divorce, and she discovered the chemicals and "recipe" while packing her belongings. She called base officials, who notified the AFOSI. Two AFOSI agents went to the house, searched, and found the LSD in appellant's clothing, in addition to the chemicals and recipe. While testimony showed Marion handled the chemicals and recipe, only supposition supports an inference that she planted the LSD in appellant's clothing. She professed surprise at the discovery of the LSD, and credible evidence supports the conclusion she was previously unaware of its presence in the house.

In addition, appellant contends his conviction for possessing drug paraphernalia cannot stand because the chemicals were lawful to purchase and no evidence shows he used, or intended to use, them to manufacture illegal drugs. Even possession of the recipe does not show that intent, he argues, because a crucial ingredient, "baby Hawaiian wood rose seeds," was not found at the home.

As we observed in discussing the first issue, due process requires that a statute which criminalizes possession of otherwise innocent items includes a *scienter* or mens rea requirement. *United States v. Cannon,* 13 M.J. 777, 778 (A.C.M.R.1982), *citing Franza v. Carey,* 518 F.Supp. 324, 334 (S.D.N.Y.1981). *See also, United States v. Dykes,* 6 M.J. 744, 747 (N.M.C.M.R.1978); *United States v. Sweney,* 48 C.M.R. 476 (A.C.M.R.1974). We infer from the Air Force directive prohibiting possession of drug paraphernalia such a requirement. AFR 30–2, paragraph 3–3c(4), bars possession of items "used, intended to be used, or designed to be used" in connection with illegal controlled substances. Here, the trial judge correctly instructed the members they may not find appellant guilty unless convinced beyond a reasonable doubt his possession was "with the intent to use them to manufacture, compound, convert, produce, or process lysergic acid or lysergic acid amide."

The evidence shows appellant possessed written instructions, a "recipe," for making controlled substances, with two of the chemicals needed for the process. It was not necessary that he be shown to possess *all* of the needed ingredients for the illegal drugs in order to be convicted of possession of drug paraphernalia. His possession of the recipe and some of the needed chemicals was sufficient to demonstrate criminal possession of drug paraphernalia. Our independent review of the evidence also convinces us of appellant's guilt beyond a reasonable doubt.

## V

We have considered appellant's remaining assignments of error and find them without merit. On the basis of the entire record, the approved findings of guilty and the sentence are

AFFIRMED.

Chief Judge DIXON and Judge GRUNICK concur.